UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-23938-CIV-KING

ANDRES FELIPE ARIAS LEIVA,

    *Petitioner*,

    v.

ROBERT WILSON as Acting Warden,
    Federal Detention Center,
    Miami, Florida,
JEFFERSON SESSIONS III,
    U.S. Attorney General,
REX TILLERSON,
    U.S. Secretary of State,

    *Respondents*.
_____/

**MOTION FOR RELEASE ON BAIL AND REQUEST FOR HEARING**

The petitioner, Andres Felipe Arias Leiva, moves for release on bail. Dr. Arias is the former Minister of Agriculture for the Republic of Colombia. He served under President Alvaro Uribe, who is widely credited with transforming Colombia into a thriving democracy as its leader from 2002 to 2010. Before his arrest pursuant to Colombia's extradition complaint, Dr. Arias had lived and worked openly in Broward County for two years. He came to the United States with the full knowledge and help of the U.S. Embassy at Bogota to seek political asylum for himself, his wife, and his two small children. The Arias family's asylum application has been pending since they arrived here in 2014.

**I.   Dr. Arias, a former cabinet minister in Colombia, complied with all conditions of bail and is not a flight risk.**

Throughout most of the time Colombia's extradition request was pending, Dr. Arias was not imprisoned. The Extradition Court conditioned his release on a $1 million personal surety bond, a $100,000 ten-percent bond, electronic monitoring, and a curfew. *See* DE48.[1] The Extradition Court set bail because it had serious doubts that there was any extradition treaty in effect on which to base its jurisdiction. DE53:43.

---

[1] Docket entries refer to the underlying extradition proceeding, No. 16-23468-M-JJO.

Dr. Arias' release on bail has broad support from people with knowledge of the exceptional circumstances. Former U.S. Congressman Lincoln Diaz-Balart wrote that Colombia's prosecution of Dr. Arias was "politically motivated and profoundly unfair." He confirmed that the administration of Juan Manuel Santos, who ran against Dr. Arias for president and won, politicized the judicial system to "destroy respected opponents," including Dr. Arias. Eduardo A. Gamarra, professor of political science at Florida International University, stated that Dr. Arias' prosecution and conviction were part of "a well-defined political strategy" against anyone who challenged the Santos Administration's negotiations with the terrorist FARC group. Prof. Gamarra's affirmed that the Santos Administration's efforts to politicize the Colombian courts resulted in "the loss of independence of the judiciary in Colombia." Former President Uribe wrote that Dr. Arias was a distinguished economist with a "remarkable academic record—including a Ph.D. in Economics from UCLA" who became "yet another victim of the Supreme Court of Colombia's relentless persecution against a number of high-ranking members of my Administration." President Uribe also noted that the U.S. Ambassador to Colombia was aware of Dr. Arias' decision to leave Colombia and seek asylum in the United States. *See* DE27:9–17.

**II.     This Court should exercise its power to grant bail because Dr. Arias is likely to succeed in showing entitlement to the writ and is not a flight risk.**

   **A.     This Court has the inherent power to grant bail.**

After it erroneously certified extradition, the Extradition Court remanded Dr. Arias into custody primarily because the court interpreted 18 U.S.C. § 3184 as prohibiting bail at that stage. This Court, however, has the "inherent power as the habeas corpus court or judge" to release the petitioner on bail if, in the court's view, the circumstances warrant release. *Jimenez v. Aristiguieta*, 314 F.2d 649, 652 (CA5 1963). To obtain bail, a habeas petitioner who has been convicted must show a likelihood of success on a substantial constitutional question and also "some circumstance making this application exceptional and deserving of special treatment in the interests of justice." *Aronson v. May*, 85 S.Ct. 3, 5 (1964) (Douglas, J., in chambers); *see Calley v. Callaway*, 496 F.2d 701, (CA5 1974) (stating that bail should be granted after conviction to a habeas petitioner only when the petitioner

2

has shown likelihood of success and exceptional circumstances) (citing *Aronson*). When there has been no judicial determination of guilt, only the first showing must be made; there is no requirement of exceptional circumstances.[2]

Dr. Arias is not a flight risk. Dr. Arias came to this country with the full knowledge and support of the U.S. State Department. He immediately sought asylum and is confident that he will get it because other targets of the Santos Administration have already received asylum protection. There is a very high likelihood that he will succeed in obtaining a writ of habeas corpus because an overwhelming amount of record evidence proves there is no extradition treaty between Colombia and the United States. Dr. Arias also brings other claims that are likewise well supported and would entitle him to release. For nearly a year, Dr. Arias faithfully complied with every bail condition the Extradition Court imposed.

**B.     Dr. Arias is likely to succeed primarily because there is no extradition treaty between Colombia and the United States.**

Colombia routinely refuses U.S. extradition requests and yet insists that the United States is obligated to extradite President Santos' chief rival for the presidency of Colombia. President Santos himself has publically stated that the reason Colombia refuses U.S. extradition requests is that there is no extradition treaty between the United States and Colombia. The Colombian Supreme Court of Justice held in 1986 and again in 1987 that the Extradition Treaty on which the Extradition Court relied for jurisdiction was never lawfully ratified. It is beyond dispute that the treaty is not in force:

● President Santos has publically said so: "We have an extradition agreement with Venezuela, not with the United States." EFE NEWS (6 Apr 2011); *see also* DE39-2.

● His immediate predecessor, President Uribe, has said so: "Colombia does not recognize the treaty as valid or in effect because it was not properly ratified as explained by the Supreme Court of Justice in 1986 and 1987." DE39-1:1.

---

[2]The Colombian court that convicted Dr. Arias was, according to the U.S. Embassy at Bogota and the U.S. Drug Enforcement Agency, tainted by bribery and corruption. The reasoning of *Aronson* and *Calley*, which involved convictions in U.S. courts, therefore does not apply. Nonetheless, Dr. Arias meets even the higher standard for bail.

3

● This Court has said so. *See United States v. Benitez*, 28 F.Supp.2d 1361, 1363 n.2 (SDFL 1998) ("In 1987, the Colombian Supreme Court annulled Colombia's extradition treaty with the United States.") (Judge Gonzalez); *United States v. Abbell*, 963 F.Supp. 1178, 1189 n.22 (SDFL 1997) ("[T]he Colombian Supreme Court declared unconstitutional the extradition treaty between Colombia and the United States.") (Judge Hoeveler).

● The Eleventh Circuit has said so. *See United States v. Valencia-Trujillo*, 573 F.3d 1171, 1179 n.1 (CA11 2009) ("In 1986, the Colombian Supreme Court declared the law ratifying the treaty invalid."); *United States v. Duarte-Acero*, 296 F.3d 1277, 1279 (CA11 2002) ("In 1987, the *Corte Suprema de Justicia* annulled the extradition treaty altogether, finding its ratification unconstitutional."); *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1302 n.1 (CA11 2000) ("In 1986, the Colombian Supreme Court held that Law 27 was unconstitutional because it had been sanctioned by a Colombian government official other than the President of Colombia. Because of this ruling, the treaty lacks force in Colombia.").

● Even Colombia's oral statements in the Extradition Court and filings, including its diplomatic note, have said so. *See* DE54:3 (stating that, because the Colombian Supreme Court of Justice held unconstitutional the law that would have ratified the Treaty, "Colombia execut[es] extraditions to the United States pursuant to its domestic law"); DE54-1:8–9 ("[I]n the Republic of Colombia the treaty cannot be applied … . In this sense, the extradition requests that the United States of America presents to Colombia, cannot be processed, neither granted or denied, in accordance to the Treaty of 1979 … ."); DE53:25 ("EXTRADITION COURT: 'You are in agreement that it is Colombia's view that the treaty is not in effect?' AUSA: 'Correct, Your Honor.'"); DE53:21 ("The treaty is not in effect as far as domestically in Colombia. Colombia does not extradite people to the United States pursuant to the treaty.").

Thus, even while Dr. Arias' extradition case was pending in federal court, Colombia refused several U.S. extradition requests. All of those requests were for offenses specifically enumerated in the Treaty that was never ratified. *See, e.g.*, DE68:1–2 (Colombia denied the extradition of Hemer Gonzalez-Rivas to Middle District of Florida on 22 Feb 2017.); DE56:4-–6 (Colombia extradited drug kingpin Walid Makled Garcia to Venezuela rather than the

4

United States because, according to President Santos, Colombia has "an extradition agreement with Venezuela, not with the United States."); DE39:2–3 (describing several extradition requests that Colombia denied). Additionally, several federal court decisions reflect that Colombia denies or limits, in its sole discretion, U.S. extradition requests for crimes listed in the Treaty. *See, e.g.*, *United States v. Murillo*, 826 F.3d 152 (CA4 2016) (murder of a United States officer [Treaty App'x ¶ 1]); *United States v. Alvarado*, 808 F.3d 474, 482 (CA11 2015) (providing weapons to terrorists [Treaty App'x ¶ 20]); *United States v. Mosquera*, 580 F. App'x 580 (CA9 2014) (misusing a Social Security number to get a car loan [Treaty App'x ¶ 10]); *Rodriguez v. United States*, No. 11-2957, 2013 WL 6171618 (SDNY 25 Nov 2013) (homicide [Treaty App'x ¶ 1], illegal gun possession [Treaty App'x ¶ 20], theft conspiracy [Treaty App'x ¶¶ 9, 10]).

Because there is no extradition treaty, the Extradition Court had no subject-matter jurisdiction over Colombia's extradition complaint. *See* 18 U.S.C. § 3184 (stating that there is jurisdiction over an extradition proceeding "[w]henever there is a treaty or convention for extradition between the United States and any foreign government … ."); *see also Terlinden v. Ames*, 184 U.S. 184 U.S. 270, 280 (1902) (stating that the extradition court had jurisdiction only "if there was a treaty"); *Benson v. McMahon*, 127 U.S. 457, 463 (1888) (referring to § 3184 as the "act of congress conferring jurisdiction upon the commissioner, or other examining officer"); *see also Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10 (1936) (holding that the United States cannot surrender anyone "to a foreign government where an extradition treaty or convention does not provide for such surrender.").

### C.   Dr. Arias also brings other substantial constitutional claims.

The habeas petition raises six other constitutional claims because this is, indeed, an extraordinary case. All of these claims are well supported and Dr. Arias to release.

***Article III Claims.*** The first three claims arise under Article III. As Colombia's highest court twice determined 30 years ago, Colombia never lawfully ratified the Extradition Treaty. That explains why no Colombian official was willing to sign the extradition complaint, which alleged that the Treat is in effect. The Extradition Court relied on *Rice v. Ames*, 180

U.S. 371 (1901), to support its erroneous belief that an Assistant United States Attorney could swear to the complaint in place of a Colombian official. However, that case holds the exact opposite. The Supreme Court plainly held that the oath must be made by an official of the requesting state: "If *the officer of the foreign government* has no personal knowledge of the facts, he may with entire propriety make the complaint upon information and belief, stating the sources of his information and the grounds of his belief … ." 180 U.S. at 375–76 (emphasis added). No Colombian official will swear to the complaint because Colombia has steadfastly refused to state that the Extradition Treaty is in force and has repeatedly reaffirmed that it is not in force by continuing to deny U.S. extradition requests.

Also, federal judicial power does not extend to reviewing actions taken by another sovereign nation, even if those acts are later declared unlawful by that nation. The Act of State Doctrine keeps federal courts out of other countries' political disputes. Dr. Arias was prosecuted for acts taken in his capacity as Minister of Agriculture for the Republic of Colombia. Colombia is trying to use American courts to settle foreign political scores, and the Act of State Doctrine exists precisely to keep our courts from taking sides in foreign politics.

***Fourth Amendment Probable Cause Claims.*** The fourth, fifth, and sixth claims are independent reasons why the Fourth Amendment's requirement that all prolonged seizures be supported by probable cause was not satisfied. The Extradition Court erred in holding that the acts underlying Dr. Arias' Colombian convictions constitute crimes under United States law. Consequently, dual criminality cannot be established, which makes Dr. Arias' seizure constitutionally unreasonable.

Additionally, probable cause and dual criminality cannot be established because no United States court would hold a U.S. Secretary of Agriculture criminally accountable for discretionary policy decisions undertaken by the U.S. Department of Agriculture. For that additional reason, Dr. Arias' acts would not be a crime in this country, and his arrest and detention violate the Fourth Amendment.

The only evidence Colombia presented the Extradition Court to establish probable cause to believe Dr. Arias committed a crime was the Colombian Supreme Court of Justice's

opinion. However, the Deputy Chief of the U.S. Mission to Colombia had reported to the State Department that the court was "politicized" and had taken over Colombia's attorney general's office. While the extradition proceeding was pending, the U.S. Drug Enforcement Agency revealed that at least three Colombian magistrates who presided over Dr. Arias' trial, including the chief magistrate, took bribes for court rulings. Despite all this evidence that the Colombian court was tainted by corruption, the Extradition Court nonetheless accepted its decision as irrebuttable evidence of probable cause.

***Fifth Amendment Due Process and Sixth Amendment Compulsory Process Claim.*** It is well-established that an extradition relator is entitled to present testimony that explains or puts into context the evidence presented by the requesting state in support of extradition. Nonetheless, the Extradition Court refused to allow Dr. Arias to call witnesses who would have established that the Colombian Supreme Court of Justice's decision was unreliable and that the Extradition Treaty was not in force. Without hearing from any of Dr. Arias' witnesses, the Extradition Court decided that nothing they said could make any difference.

**D.    This case presents exceptional circumstances, including Colombia's refusal to say the treaty is in force.**

Before the 2010 Colombian presidential election, Dr. Arias was the early frontrunner to succeed President Uribe. His campaign was derailed by a scandal fueled by news outlets controlled by the family of Santos, who also served in the Uribe Administration. Santos won the presidency, betrayed the Uribe agenda, and began prosecuting his former colleagues, including Dr. Arias. The most controversial break with President Uribe's policies was Santos' decision to negotiate a peace accord with the FARC, a guerilla group that waged war against the Colombian government for decades.

Many FARC members are under indictment in U.S. courts for drug trafficking and violent crimes, but the Santos Administration has refused to extradite *any* of them on the ground that it has no obligation to do so. In 2011, Colombia refused to extradite a notorious drug trafficker to the United States and instead sent him to Venezuela. President Santos explained: "We have an extradition agreement with Venezuela, not with the United States."

7

When it became clear to Dr. Arias that the Santos Administration had brought the judiciary under its control, he sought help from the U.S. Embassy at Bogota. The State Department personnel there renewed Dr. Arias' visa while his trial was ending and told him that he and his wife and children were free to enter the United States to seek asylum. They assured him that the State Department would recommend that the Department of Homeland Security view his application favorably.

The Santos Administration knew at all times that Dr. Arias was in South Florida but made no attempt to extradite him until its negotiations with the FARC in Havana, Cuba, were at an end. The request for Dr. Arias' arrest and extradition was timed to communicate to all Colombia that the government would not tolerate opposition to the peace deal. Colombian voters nonetheless later rejected the deal in a referendum held following Dr. Arias' arrest. The Santos Administration disregarded the referendum and moved forward with the peace accord anyway, all the while denying one U.S. extradition request after another. As President Santos explained in a speech at the United Nations: "Nobody is going to lay down their weapons to spend 40 years in a U.S. jail."

## Prayer for Relief and Request for Hearing

WHEREFORE Dr. Arias requests that this Court re-impose the same conditions of bail that the Extradition Court set for Dr. Arias. This Court has the inherent power to do that and should exercise it because Dr. Arias is likely to succeed, because this case presents extraordinary circumstances entailing an abuse of U.S. courts, and because Dr. Arias poses no risk of flight as he came here with the support of the U.S. State Department. Dr. Arias requests a hearing on this motion.

Respectfully submitted,

/s/ David Oscar Markus  
David Oscar Markus  
Florida Bar No. 119318  
Lauren Doyle  
Florida Bar No. 117687  
Markus/Moss PLLC  
40 N.W. Third Street Penthouse One  
Miami, Florida 33128  
305-379-6667  

/s/ Ricardo J. Bascuas  
Ricardo J. Bascuas  
Florida Bar No. 093157  
1311 Miller Drive  
Coral Gables, Florida 33146  
305-284-2672  

*/s/ Marc David Seitles*  
Marc David Seitles  
Florida Bar No. 0178284  
Seitles & Litwin PA  
40 N.W. Third Street, Penthouse One  
Miami, Florida 33128  
305-403-8070  

## CERTIFICATE OF SERVICE

This notice was filed electronically through CM/ECF on 6 November 2017 and served on the United States Attorney's Office through that system.

/s/ Ricardo J. Bascuas  
Ricardo J. Bascuas