UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-cv-23938-JLK

ANDRES FELIPE ARIAS LEIVA,

      Petitioner,

v.

ROBERT WILSON, Acting Warden of the
Federal Detention Center Miami,

JEFFERSON SESSIONS III,
United States Attorney General, and

REX TILLERSON,
United States Secretary of State,

      Respondents.

_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S VERIFIED AMENDED PETITION FOR WRIT OF HABEAS CORPUS

The United States of America, by and through its undersigned counsel, hereby responds in opposition to the Verified Petition for Writ of Habeas Corpus filed by Andres Felipe Arias Leiva ("Petitioner") challenging U.S. Magistrate Judge John J. O'Sullivan's certification (HC DE 1) that Petitioner may be extradited to Colombia to serve a sentence imposed by the Supreme Court of Justice, in Bogotá, Colombia ("Supreme Court of Colombia") for two crimes, Embezzlement for Third Parties and Conclusion of Contract Without Fulfilling Legal Requirements, committed while he served as Colombia's Minister of Agriculture and Rural Development ("Minister of Agriculture").[1]

---

[1] All record citations to the events in Petitioner's extradition case are denoted as "EX DE #" and reference the docket in Southern District of Florida Case Number 16-23468-MC-O'SULLIVAN.  All record citations to the events concerning Petitioner's *habeas corpus* petition are denoted as "HC DE #" and reference the docket in Southern District of Florida Case Number 17-cv-23938.

On September 29, 2017, Magistrate Judge O'Sullivan issued an order detailing his certification that Petitioner is extraditable to Colombia to serve a sentence for these convictions (Extradition Certification and Order of Commitment, "Certification," EX DE 110).  Petitioner now seeks to re-litigate a litany of arguments that Magistrate Judge O'Sullivan previously considered and rejected.  As discussed herein, these arguments have even less merit now, in a *habeas* proceeding, than they did before Magistrate Judge O'Sullivan.

*First*, Petitioner argues—contrary to the unequivocal official statements provided by the United States and Colombia in this case—that the extradition treaty between those two countries, the Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8 (1981) (hereinafter, "the Treaty"),[2] is not in force.  In fact, the Treaty entered into force on March 4, 1982, remains in force, and continues to serve as a valuable international law-enforcement tool and a vital component of U.S. foreign policy in Latin America. Petitioner protests that the Supreme Court of Colombia struck down the Colombian legislation ratifying the Treaty, but that fact is unavailing because whether the Treaty was properly ratified in Colombia is a nonjusticiable political question and, even if it were justiciable, the Court must defer to the view of the U.S. Department of State that the Treaty is in force.

*Second*, even though Magistrate Judge O'Sullivan unambiguously retained subject-matter jurisdiction over the proceeding below pursuant to 18 U.S.C. § 3184, Petitioner argues that jurisdiction was lacking because (1) the act-of-state and political-question doctrines constrain a court's Article III power, and (2) the extradition complaint was signed by the undersigned Assistant U.S. Attorney instead of a Colombian official.  These arguments demonstrate a fundamental misunderstanding of U.S. extradition practice.  Extradition proceedings—which are routinely initiated by Assistant U.S. Attorneys—are not Article III proceedings, and neither the act-of-state doctrine nor the political-question doctrine prevents certifying Petitioner's extradition to serve a sentence for his convictions.

*Third*, Petitioner makes the sensational claim that the court that convicted him—the highest court of one of the United States's strongest treaty partners—is "politicized and corrupt."  On that basis, he invites this Court to create an unprecedented exception to case law dictating that his conviction, obtained after a lengthy trial where Petitioner was present and represented by counsel,

---

[2] A copy of the Treaty appears at EX DE 82-1.

conclusively establishes probable cause that he committed the two offenses for which his extradition is sought. Petitioner advances this argument with no supporting authority (as there is none), and he ignores the deferential *habeas* standard of review applicable to Magistrate Judge O'Sullivan's probable cause determination, as well as the well-established rule of non-inquiry that prohibits U.S. courts from passing judgment on their foreign counterparts.

*Fourth*, Petitioner contends, again without proper factual or legal support, that the two crimes for which he was convicted are not encompassed by the Treaty. The Supreme Court of Colombia's detailed recitation of the conduct underlying his conviction leaves no doubt that such conduct was punishable in Colombia and would have amounted to embezzlement and false-statement offenses in the United States, had it been committed here. The offenses of conviction are, therefore, extraditable under the Treaty.

*Fifth*, Petitioner claims that his "due process" right to present explanatory evidence was violated when Magistrate Judge O'Sullivan refused to allow him to subpoena the testimony of four non-resident witnesses from the U.S. Department of State at the extradition hearing. Accepting this claim would require the Court to exceed the scope of its review and to ignore Supreme Court, Eleventh Circuit, and other precedent regarding the limited rights available to fugitives and the limited category of evidence fugitives are permitted to offer in extradition proceedings.

Accordingly, Petitioner's claims are unavailing, and his petition should be denied.

## I.  FACTS AND PROCEDURAL BACKGROUND

### A.  <u>Statutory Background</u>

Extradition is a means by which a fugitive such as Petitioner is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment. In the United States, it is primarily an executive function, with a limited role carved out for a judge pursuant to the federal extradition statute, 18 U.S.C. § 3184. That statute requires a judge to hold a hearing to consider the evidence of criminality presented by the foreign country and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. The judge is not authorized to determine whether the evidence is sufficient to justify conviction, as that determination will be made by the foreign court that handles the case. *See Collins v. Loisel*, 259 U.S. 309, 316 (1922). If the judge finds that the evidence is sufficient as required under Section 3184, he or she "shall certify [his or her findings] . . . to the Secretary of State." 18 U.S.C. § 3184.

3

An extradition proceeding is neither a criminal nor a civil matter, but rather is essentially "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite [a fugitive] at the request of a foreign government." *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017). Accordingly, extradition proceedings are of a "singular nature," *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828 (11th Cir. 1993), and "an officer who presides over such a proceeding is not exercising 'any part of the judicial power of the United States.' Rather, the officer acts in a non-institutional capacity by virtue of a 'special authority.' The officer's only tasks are to determine whether an individual is extraditable, and if so, to certify extraditability to the ultimate decisionmaker (the Secretary of State)." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (quoting *In re Kaine*, 55 U.S. (14 How.) 103, 120 (1852), and *In re Metzger*, 46 U.S. (5 How.) 176, 191 (1847)) (citations omitted).

Thus, it is the Secretary of State, and not the judge, who decides whether or not to surrender the fugitive to the foreign country. 18 U.S.C. § 3186; *see also Martin*, 993 F.2d at 829. While the judge's role is highly circumscribed, the Secretary, when making a decision on surrender, "exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not," including the state of the foreign country's judicial system, humanitarian considerations, and applicable statutes, treaties, or policies regarding appropriate treatment in the foreign country. *Martin*, 993 F.2d at 829 & 830 n.10; *see, e.g.*, *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980), *cert. denied*, 449 U.S. 1036 (1980); *Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d Cir. 1976), *cert. denied*, 429 U.S. 833 (1976). This separation of roles is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the Executive's powers to conduct foreign affairs. *See In re Kaine*, 55 U.S. at 110.

As discussed further herein, an extradition judge's certification order pursuant to Section 3184 is not subject to direct appeal; however, "limited" collateral review is available by way of a petition for a writ of *habeas corpus*. *See Noriega v. Pastrana*, 564 F.3d 1290, 1295 (11th Cir. 2009); *Martin*, 993 F.2d at 828-29.

### B.      Colombian Procedural History

In this case, the Government of Colombia seeks the extradition of Petitioner, a citizen of Colombia, so that he may serve a sentence imposed for his commission of two crimes, Embezzlement for Third Parties, in violation of Article 397 of the Colombian Criminal Code, and Conclusion of Contract Without Fulfilling Legal Requirements, in violation of Article 410 of the same code.  On October 12, 2011, the Attorney General of Colombia formally charged Petitioner with those offenses.  Petitioner's trial, at which he was present and represented by counsel, began on June 14, 2012, and ended on February 25, 2014.

On June 13, 2014, Petitioner fled Colombia by plane to the United States.  On July 16, 2014, the Criminal Cassation Division of the Supreme Court of Colombia issued a judgment convicting him of the two offenses and sentencing him to 209 months and eight days of imprisonment ("Conviction").[3]  *See* Certification at 8.  Two days later, the same court issued a warrant for Petitioner's arrest.

### C.      Facts Regarding the Crimes

The evidence submitted by Colombia in support of its request for Petitioner's extradition includes the 193-page decision issued by the Supreme Court of Colombia convicting Petitioner of the two crimes for which his extradition is sought.  As set forth in that decision, Petitioner's criminal conduct relates to the Colombian government's Argo Ingreso Seguro ("AIS") program, which Petitioner was responsible for implementing during his term as Minister of Agriculture, a cabinet-level position in Colombia's executive branch, from 2005 to 2009.  The creation of the AIS program was authorized in 2006 during the final round of trade negotiations with the United States preceding the ratification of the U.S.-Colombia Free Trade Agreement.  The program was intended, *inter alia*, to provide direct government assistance to the agricultural sector to prepare it for the challenges arising from the increasing globalization of the economy and to reduce inequality in rural areas.  *See id.* at 9.  Under the AIS program, the Government of Colombia allocated millions of Colombian pesos to the Ministry of Agriculture and Rural Development ("the

---

[3] The judgment of conviction issued by the Supreme Court of Colombia (referred to herein as "Conviction") is included as an unscanned attachment to the Complaint (EX DE 1-1), at pages 445 through 640.  All citations to that decision herein refer to the page numbers ascribed to the English translation located at the bottom, center of each page.

Ministry") for investment in various agricultural programs, including projects intended to improve Colombian irrigation and drainage systems.  *Id.* at 11.

Petitioner actively promoted the AIS program and played a significant role in the passage of the law formally creating it, Law 1133 of 2007.  Conviction at 31.  Once the program was established, Petitioner, who had presidential aspirations, illegally used it to invest in rural areas in Colombia in such a way that was politically advantageous to him.  As explained below, in implementing the AIS program, Petitioner willfully violated Colombian law in a number of ways, including by circumventing the required public tender process and by diverting funds in such a way that would benefit him politically.

### 1. Petitioner Falsely Designated AIS-Related Contracts as "Scientific and Technical" and Circumvented the Required Public Bidding Process

Shortly after AIS's creation in 2006, Petitioner engaged a private company, Instituto Interamericano de Cooperacion para la Agricultura ("IICA"), as a contractor to administer AIS program funds.  Certification at 9-10.  In general, Colombian law requires that all government contractors must be chosen through a public bidding process, although certain exceptions are allowed, including where the objective of a contract is "scientific and technical," *id.* at 9, as defined by Decree 393 of 1991 and Decree 591 of 1991.  Pursuant to those laws, the standard for determining whether the objective of a contract may be considered "scientific and technical" is based on whether the contractor's designated work falls into certain enumerated activities.  *See* Conviction at 75-76.  The Supreme Court of Colombia determined that Petitioner knew of his obligation to comply with such laws.  Certification at 10.

Regardless, Petitioner entered into three agreements with IICA (hereinafter, the "Agreements") directly, without utilizing the required public bidding process.  *Id.* at 9-10.  In order to bypass that process, Petitioner, who signed the Agreements on behalf of the Ministry, falsely designated the Agreements as being for "scientific and technical cooperation."  *See id.* at 10.  The Supreme Court of Colombia determined that, in fact, none of IICA's responsibilities were scientific and/or technical, but rather, they were purely administrative, and IICA simply contracted the scientific and technical aspects of irrigation and drainage projects to third parties.  *Id.*; Conviction at 106, 120-21.  Accordingly, the exception to the requirement of using the public bidding process did not apply to the IICA contracts.  *See* Certification at 10.

The Supreme Court of Colombia held that Petitioner made the false representations "willingly" in violation of Colombian law.  *Id.*  The court further explained that Petitioner wanted

to select IICA as the contractor for the AIS program to advance his interest in executing funds allocated to the irrigation and drainage components as soon as possible and to enable him to maintain control of the AIS program and the disbursement of its funds. *See id.* at 10-11.[4]

## 2.   Petitioner Diverted Public Funds for His Own Political Gain

In addition to approving and signing the Agreements, Petitioner was actively involved in implementing the AIS program. Petitioner was kept informed of all relevant developments with the Agreements. Conviction at 113. He also made all relevant decisions regarding the distribution of approximately USD$91,723,160 in AIS funds which were allocated to IICA under the Agreements, including the types of projects to be financed, the maximum amount of financing per project, the percentage of the subsidies awarded, and timelines for the presentation and execution of projects. Conviction at 4, 133-137, 162.

Accordingly, Petitioner was able to direct public funds through IICA to specific agricultural sectors. One component of the AIS program was the provision of subsidies to select investment projects in irrigation systems through a "public contest." Conviction at 77. Petitioner exercised control over this contest, *id.* at 137, 143, & 167, which turned out to be a "scandal," *id.* at 165, rife with "fraud," *id.* at 161, 162, & 166, and which resulted in over USD$8 million in public funds being illegally appropriated to eleven Colombian families and companies which Petitioner "wished to favor," *id.* at 167 & 191; *see also* Certification at 11. According to the Supreme Court of Colombia, "[t]he Minister's true purpose was shown in the trial, where it was established that the beneficiaries of the program were called to support [Petitioner's Vice-Presidential] campaign." Conviction at 24.

As explained by the Supreme Court of Colombia, the fraudulent means by which public funds were diverted to the eleven families included awarding subsidies to families who had fictitiously subdivided their properties. Certification at 11. This allowed the large farms improperly to apply for and receive multiple distributions of AIS subsidies for a single property. By contrast, smaller farms could not subdivide their lands and, as a result, received far less in AIS subsidies. The fraud also included awarding subsidies to families who had submitted multiple proposals through different partners or legal representatives, even though in some cases the

---

[4] The Supreme Court of Colombia also noted that Petitioner was able to use funds provided to IICA improperly to pay for expenses such as charter flights and lunches, *inter alia*. Conviction at 122-23.

proposals were identical. *Id.* Further, the fraud included awarding subsidies to families who submitted "defective" Request for Proposals ("RFPs") which had subsequently been "reclassified," even though the reclassification did not address the proposals' deficiencies. *Id.*

The Supreme Court of Colombia determined that Petitioner was responsible for the disproportionate distribution of AIS subsidies to the eleven families, and that he "'voluntarily carried it out,'" as he controlled the management of the relevant resources. *Id.* (quoting Conviction at 162). In addition, the court noted that Petitioner ignored a report issued in 2007 by Econometria S.A., a consulting firm with experience in evaluating Colombian government programs, which warned that "it was foreseeable . . . that projects could be subdivide[d], and that in that way [applicants] would have access to greater benefits" under the AIS program. *Id.*; Conviction at 164.

Petitioner strenuously argued at trial that he was not responsible for any fraudulent conduct, but the Supreme Court of Colombia unambiguously rejected that defense as "nothing more than a way of eluding his responsibility." Conviction at 164. Ultimately, the court found that Petitioner "'knew of the illegality of his conduct,'" Certification at 11, and that his culpability was "clear," Conviction at 169.

### D.    U.S. Procedural History

On November 21, 2014, the Government of Colombia submitted a formal request for Petitioner's extradition pursuant to the Treaty via diplomatic note to the United States. *See* EX DE 1-1. The United States, acting in response to that request, obtained a warrant for Petitioner's arrest from Magistrate Judge O'Sullivan, which was executed on August 24, 2016, in Weston, Florida. *See* EX DE 20. At his initial appearance, Petitioner applied for bail, but, following a detention hearing held on August 26, 2016, U.S. Magistrate Judge Alicia M. Otazo-Reyes rejected Petitioner's application. *See* EX DE 16. Thereafter, Petitioner obtained new counsel and filed a motion to reconsider Magistrate Judge Otazo-Reyes's detention order, which Magistrate Judge O'Sullivan denied in an order issued on October 21, 2016. *See* EX DE 34.

Three days later, Petitioner filed an emergency motion to dismiss, alleging (as he does now) that there is no extradition treaty in effect between the United States and Colombia. *See* EX DE 35. The government opposed his motion, relying in part on a declaration from Tom Heinemann, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser for the U.S. Department of State, dated April 20, 2016, which the government had attached to its Complaint, stating that the Treaty is in force, as well as a supplemental declaration

by Mr. Heinemann dated October 26, 2016, further explaining the Department of State's view that the Treaty is in force.  *See* EX DE 1-1; EX DE 37; EX DE 37-1.  On November 17, 2016, Magistrate Judge O'Sullivan held a hearing on the motion, which he took under advisement at that time.  At the hearing, he decided to release Petitioner on bail because he found that the question raised in the motion lessened Petitioner's risk of flight and constituted a "special circumstance." *See* EX DE 53 at 39:7-40:1, 43:10-44:7.  Both parties later submitted supplemental briefing on the pending motion.  *See* EX DE 54, EX DE 56.  Along with its brief, the government filed another supplemental declaration by Mr. Heinemann dated December 16, 2016, attaching a diplomatic note dated December 2, 2016, from the Government of Colombia providing its view that the Treaty "continues currently in force."  EX DE 54-1 at 9.  The Department of State explained that the diplomatic note "confirms that the Government of Colombia shares the same position as the United States . . . that the [T]reaty remains in force."  EX DE 54-1 at 1.  On February 2, 2017, Magistrate Judge O'Sullivan denied Petitioner's motion to dismiss, finding that the Treaty is "in full force and effect" given that "[t]he official positions of the government of the United States and the government of Colombia—that the Extradition Treaty remains in effect—have been established through the declaration of Mr. Heinemann and the Diplomatic Note."  EX DE 59 at 6, 10-11.

Petitioner subsequently filed myriad motions and petitions, including a petition for a writ of prohibition in the district court challenging the authority of Magistrate Judge O'Sullivan to proceed with the extradition hearing, Case No. 17-cv-20493 (S.D. Fla. 2017), which he later voluntarily withdrew, and a petition for a writ of prohibition in the Court of Appeals for the Eleventh Circuit, which the court later dismissed, Order, *In re: Leiva*, No. 17-10946 (11th Cir. Apr. 5, 2017).  Both parties also submitted additional briefing on the issue of whether Petitioner is extraditable to Colombia.  EX DE 82, DE EX 85, EX DE 94.

On August 21, 2017, without seeking leave of court, Petitioner issued criminal subpoenas to four officials of the U.S. Department of State (none of whom resided or worked within the District at that time): Mr. Heinemann; Drew Blakeney, former Director of the Political Section of the U.S. Embassy in Bogotá, Colombia; Silvana Del Valle Rodriguez, former First Secretary for Political Affairs of the same embassy; and Federico Salcedo, former Specialist for the Political Section of the same embassy.  *See* EX DE 99-1.  The subpoenas sought to compel the attendance of these four individuals at the upcoming extradition hearing so as to obtain testimony from Mr. Heinemann regarding the above-described Department of State declarations attesting that the

Treaty is in force, and testimony from the three former embassy personnel regarding their awareness of the Colombian criminal case pending against Petitioner when he submitted a visa application to the United States following his flight from Colombia. *Id.* The subpoenas also sought to compel the production of documents relating more broadly to Petitioner. *Id.* The government filed a motion to quash the subpoenas, which Petitioner opposed. *See* EX DE 99, EX DE 103; *see also* EX DE 106. On September 25, 2017, Magistrate Judge O'Sullivan granted the motion and quashed the subpoenas, finding that Petitioner "failed to show the relevance of the documents and testimony he seeks." EX DE 107 at 1-2.

On September 28, 2017, Magistrate Judge O'Sullivan held a hearing pursuant to 18 U.S.C. § 3184 to consider Colombia's request for Petitioner's extradition. At the conclusion of the hearing, Magistrate Judge O'Sullivan found Petitioner extraditable on the two Colombian offenses of conviction and ordering him remanded to the custody of the U.S. Marshal pending the Secretary of State's decision on his surrender. DE 113 at 57:17-59:17 & 65:7-66:3. The following day, Magistrate Judge O'Sullivan issued his written Certification order. *See* EX DE 110.

In the order, Magistrate Judge O'Sullivan explained that the requirements for finding Petitioner extraditable had been met, namely, that: (1) Magistrate Judge O'Sullivan was authorized to conduct the extradition hearing pursuant to 18 U.S.C. § 3184 and Rule 1(a)(3) of the Southern District of Florida Magistrate Judge Rules; (2) the Court had jurisdiction over Petitioner because he was arrested within the District; (3) the Treaty is in full force and effect, per Magistrate Judge O'Sullivan's prior order resolving that issue; (4) the crimes of conviction were covered by the Treaty because the conduct described in the Supreme Court of Colombia's Conviction would have amounted to violations of 18 U.S.C. § 641 (embezzlement) and 18 U.S.C. § 1001 (false statements) had Petitioner committed it in the United States; and (5) both the Conviction standing alone and also the evidence in record independently established probable cause that Petitioner committed the two crimes for which he was convicted. *Id.* Magistrate Judge O'Sullivan also found that the Complaint was properly drawn up, sworn to, and filed by an Assistant U.S. Attorney. *Id.* at 5-6. He rejected numerous arguments advanced by Petitioner regarding why the crimes of conviction were not covered by the Treaty, including that the conduct underlying Petitioner's convictions amounted only to failing to prevent others from committing fraud, that evidence of willfulness was lacking, that the act-of-state and political-question doctrines would bar his prosecution in the United States, and that the Colombian statute criminalizing Conclusion of Contract Without

Fulfilling Legal Requirements was not related to false statements.  *Id.* at 13-17.  In addition, Magistrate Judge O'Sullivan rejected Petitioner's argument that a judgment of conviction does not automatically establish probable cause when it was issued by an allegedly politicized court.  *Id.* at 18.  Accordingly, Magistrate Judge O'Sullivan certified to the Secretary of State that Petitioner is extraditable to Colombia on the two crimes for which he has been convicted.  *Id.* at 19.

On October 27, 2017, Petitioner filed the instant *habeas* petition against the Acting Warden of the facility where he is currently detained, U.S. Attorney General Jefferson B. Sessions III, and U.S. Secretary of State Rex W. Tillerson.[5]

## II.    ARGUMENT

Petitioner has failed to meet his burden of establishing that he is held contrary to the Constitution, law, or treaties of the United States.  Accordingly, he is not entitled to *habeas* relief pursuant to the three-part standard established by the Supreme Court, *see Fernandez v. Phillips*, 268 U.S. 311, 312 (1925), and his petition should be denied.

### A.    <u>Standard of Review</u>

In reviewing an extradition certification through a petition for a writ of *habeas corpus*, a district court may consider only three issues: (1) whether the extradition judge had jurisdiction, (2) whether the offense charged is "within" the applicable treaty, and (3) whether there was "any evidence" warranting the judge's finding that there was reasonable ground to believe the fugitive guilty.  *Fernandez*, 268 U.S. at 312.  In so doing, the court should review questions of law *de novo*

---

[5] Attorney General Sessions and Secretary of State Tillerson should be dismissed from this case as they are not proper respondents.  Generally, the only proper respondent for a *habeas* petition is "the person who has custody over [petitioner]."  28 U.S.C. § 2242; *see* 28 U.S.C. § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained."); *see also Rumsfield v. Padilla*, 542 U.S. 426, 434-35 (2004).  As the Supreme Court has explained, "[T]here is generally only one proper respondent to a given prisoner's habeas petition.  This custodian, moreover, is 'the person' with the ability to produce the prisoner's body before the habeas court."  *Padilla*, 542 U.S. at 434-35; *see, e.g.*, *United States v. Moussaoui*, 382 F.3d 453, 464-65 (4th Cir. 2004) ("Ordinarily, a habeas writ must be served on a prisoner's immediate custodian—the individual with day-to-day control over the prisoner.") (internal quotation marks and citation omitted).  Accordingly, the proper respondent on a federal *habeas* petition is generally "the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."  *Padilla*, 542 U.S. at 435.  Other parties may be named as respondents only when there is no immediate physical custodian of the petitioner. *See id.* at 439.

and questions of fact for clear error. *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994); *Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011).

"*Habeas corpus*, it is well known, is not a neutral proceeding in which the petitioner and the State stand on an equal footing.  Rather, it is an asymmetrical enterprise in which [the petitioner] seeks to overturn a presumptively valid judgment." *Skaftouros*, 667 F.3d at 158 (internal quotation marks and citations omitted); *see also Fernandez*, 268 U.S. at 312. Accordingly, the burden is on the petitioner to show by a preponderance of evidence that he is held contrary to the Constitution, law, or the treaties of the United States. *See Walker v. Johnston*, 312 U.S. 275, 286 (1941); *Skaftouros*, 667 F.3d at 158.

**B.      Magistrate Judge O'Sullivan Had Jurisdiction Over the Extradition Proceeding**

Petitioner challenges whether Magistrate Judge O'Sullivan had jurisdiction over the proceeding below on several bases, none of which has merit.  Section 3184 authorizes "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States" to conduct extradition proceedings for "any person found within his jurisdiction" who is accused of having committed certain crimes abroad "[w]henever there is a treaty or convention for extradition between the United States and any foreign government."  18 U.S.C. § 3184.  Petitioner does not challenge that he was found within the District or that Magistrate Judge O'Sullivan was properly authorized to conduct the proceeding below.  Although Petitioner contests that there is an extradition treaty in force between the United States and Colombia, his argument is contradicted by the record, which contains the official views of both the United States and Colombia that the Treaty is in force.  Petitioner's remaining "jurisdictional" challenges are baseless.

**1.      The Extradition Treaty Between the United States and Colombia Remains in Force**

Petitioner argues that the Treaty is not in force because, in his view, Colombia failed to ratify it properly.  This argument—which, if correct, would mean that every court that has certified the extraditability of a Colombian fugitive pursuant to the Treaty acted *ultra vires*—is meritless for several reasons.  The Court should decline to consider Petitioner's argument for the threshold reason that the issue of whether a treaty was properly ratified is a nonjusticiable political question. Even if the Court were to consider the issue, in light of the authority granted to the Executive under the Constitution to conduct U.S. foreign relations, the Court must defer to the view of the U.S.

Department of State that the Treaty is in force.  Moreover, this view is corroborated by the fact that the only other party to the Treaty, Colombia, agrees that the Treaty is in force.

a.    <u>Relevant Background</u>

The Treaty was signed by representatives of the United States and Colombia on September 14, 1979.  Pursuant to Article 21(2) of the Treaty, it "enter[ed] into force on the date of exchange of the instruments of ratification."  Colombia ratified the Treaty on November 3, 1980, through the passage of Law No. 27 of November 3, 1980 ("Law No. 27"), which was signed by a minister of the government to whom the President of Colombia had delegated certain functions while he was out of the country.  *United States v. Gallo-Chamorro*, 48 F.3d 502, 503 n.1 (11th Cir. 1995); *United States v. Martinez*, 755 F. Supp. 1031, 1032-33 (N.D. Ga. 1991); EX DE 54-1 at 8. Subsequently, on December 2, 1981, the U.S. Senate gave its advice and consent to ratification, and the President of the United States ratified the Treaty on January 4, 1982.  EX DE 37-1 at 2. The parties exchanged instruments of ratification on March 4, 1982, thereby triggering the Treaty's entry into force on that day pursuant to Article 21(2) of the Treaty.  *Id.*; EX DE 54-1 at 8.

On December 12, 1986—over four years after the Treaty was ratified and brought into force—the Supreme Court of Colombia found that the Colombian Constitution did not permit the President to delegate the authority to conduct international relations to a minister of government and, therefore, nullified Law No. 27.  *See* Judgment No. 41, 14 Jurisprudencia y Doctrina 1064 (1986) (cited in, among others, Joshua H. Warmund, *Removing Drug Lords and Street Pushers: the Extradition of Nationals in Colombia and the Dominican Republic*, 22 Fordham Int'l L.J. 2373, 2387 n.91 (1999)); EX DE 54-1 at 8.  Shortly thereafter, the President of Colombia promulgated a new law to replace Law No. 27, but the Supreme Court of Colombia also struck down that law as unconstitutional on June 25, 1987.  *Martinez*, 755 F. Supp. at 1033; Warmund, 22 Fordham Int'l L.J. at 2387; EX DE 54-1 at 8.  Regardless, the United States and Colombia have continued to extradite fugitives to each other based on requests made pursuant to the Treaty.  EX DE 37-1 at 4; EX DE 54-1 at 9.

As provided by Article 21(4) of the Treaty, the Treaty may be terminated when one party gives notice of termination to the other.  Neither party has ever given such notice.  EX DE 37-1 at 1-3; EX DE 54-1 at 9.  It is, therefore, the view of the U.S. Department of State that the Treaty "remains in force."  EX DE 37-1 at 2, 4.  It is similarly the view of the Colombian Ministry of Foreign Affairs that the Treaty "continues currently in force."  EX DE 54-1 at 9.  Thus, Magistrate

13

Judge O'Sullivan found that "the executive branches of the United States and Colombia have stated that it is the understanding of both sovereigns that the Extradition Treaty is currently in effect. Thus the Extradition Treaty remains in full force and effect." EX DE 59 at 10-11.

  b.   Petitioner's Claim Challenging the Ratification of the Treaty
       Presents a Political Question that Is Not Subject to Judicial Review

Petitioner's claim that the Treaty is invalid rests upon his assertion that the Treaty was not properly ratified, purportedly because the Supreme Court of Colombia nullified Colombia's ratifying legislation four years after-the-fact. This assertion is unavailing because whether the Government of Colombia properly ratified the Treaty is a nonjusticiable political question that is solely within the purview of the Executive Branch. *See Doe ex dem. Clark v. Braden*, 57 U.S. (16 How.) 635, 657 (1853).

The Supreme Court in *Braden* held that whether the King of Spain had the proper authority to ratify the treaty in which Spain ceded Florida to the United States is a "political question[], and not judicial" that "belong[s] exclusively to the political department of the government." *Id.* There, as here, the parties had ratified the treaty at issue, and it entered into force when they exchanged instruments of ratification. *Id.* at 656. The Court refused to consider the plaintiff's challenge to the validity of the ratification, noting that "the courts of justice have no right to annul or disregard any of [the treaty's] provisions, unless they violate the Constitution of the United States." *Id.* at 657.

This understanding of the role of the courts vis-à-vis treaty ratification comports with the Supreme Court's later explanation that:

> A treaty is primarily a compact between independent nations, and depends for the enforcement of its provisions on the honor and the interests of the governments which are parties to it. If these fail, its infraction becomes the subject of international reclamation and negotiation, which may lead to war to enforce them. *With this judicial tribunals have nothing to do*.

*Charlton v. Kelly*, 229 U.S. 447, 474 (1913) (citation and internal quotation marks omitted; emphasis added). Thus, "while federal courts are necessarily called upon to interpret treaties, they must observe the line between treaty interpretation on the one hand and negotiation, proposal and advice and consent and ratification on the other." *Franklin Mint Corp. v. Trans World Airlines, Inc.*, 690 F.2d 303, 311 (2d Cir. 1982) (citation omitted).

Petitioner does not ask this Court to interpret the Treaty or to decide whether the Treaty comports with the Constitution; rather, he asks the Court improperly to decide whether Colombia

successfully ratified the Treaty—an issue that lies beyond the scope of judicial review.  Because his challenge to the Treaty presents a nonjusticiable political question, this Court should reject it. *See Braden*, 57 U.S. at 657; *Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir. 2004); *Made in the USA Found. v. United States*, 242 F.3d 1300, 1302 (11th Cir. 2001) (holding that whether an international commercial agreement "constitutes a 'treaty' requiring Senate ratification presents a nonjusticiable political question"); *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990) ("[S]ome questions are so inherently political as to be excluded from judicial review. . . .  The Supreme Court has, for example, declined . . . to determine whether one ratifying a treaty [on] behalf of a foreign nation had the power to do so . . . .") (citing *Braden*, 57 U.S. 635); *see also Marine v. Bush*, 53 F. App'x 123, 124 (D.C. Cir. 2002) (affirming dismissal of claims because "[w]e could not grant relief on these claims without . . . finding that Panama did not properly ratify the treaty [in which the Panama Canal was transferred to the Republic of Panama]—a political question beyond the competence of an Article III court").

> c.  Even If the Court Were to Review Petitioner's Claim, It Must Defer to the View of the U.S. Department of State that the Treaty Is in Force

Even if this Court were to find Petitioner's challenge to the Treaty justiciable, it must defer to the view of the U.S. Department of State that the Treaty is currently in force.  The United States is aware of no decision in which a court has declared a treaty not to be in force when the U.S. Department of State says otherwise.  Petitioner faults Magistrate Judge O'Sullivan for according deference to the view of the Department of State regarding the force of the Treaty in this case, *see* HC DE 12 at 18; however, he offers no legal support or analysis for why such deference was improper—nor can he.

As this Court has held, a "long judicial tradition" supports a "general judicial policy of deference to the executive in the area of foreign relations."  *United States v. Fernandez-Pertierra*, 523 F. Supp. 1135, 1141-42 (S.D. Fla. 1981) (citing *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Haig v. Agee*, 453 U.S. 280 (1981)).  Such deference arises out of the "generally accepted view" that "foreign policy [is] the province and responsibility of the Executive," *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig*, 453 U.S. at 293-94), authority that derives from Article II of the U.S. Constitution, *see, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S.

396, 414 (2003).[6]  Judicial deference in the field of foreign relations extends to the determination by the Executive Branch—and specifically the Department of State—of whether a treaty remains in force.  *See, e.g.*, *Kastnerova*, 365 F.3d at 986 (recognizing the Department of State's view that the U.S.-Czech extradition treaty was in effect, and noting that "every other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination"); *In the Matter of the Extradition of Fletcher*, No. MC 16-00334 KJM, 2017 WL 1034199, at *4 (D. Haw. Feb. 1, 2017) ("The existence of a valid treaty of extradition between the United States and the Kingdom of Tonga is a political question about which courts defer to the executive branch.").

In this vein, the Eleventh Circuit in *Meza v. U.S. Attorney General* relied solely on the representation of the Executive Branch, presented via a declaration of an attorney adviser in the Office of the Legal Adviser for the U.S. Department of State, when considering a fugitive's argument that the extradition treaty between the United States and Honduras was invalid.  *See* 693 F.3d 1350, 1358 (11th Cir. 2012).  The court concluded that "[w]e must defer to the determination of the executive branch that the treaty between Honduras and the United States remains in force." *Id.* (emphasis added).

In the present case, the U.S. Department of State, via a declaration of Mr. Heinemann, maintains that the Treaty entered into force on March 4, 1982, and remains in force, as neither party to the Treaty has given notice of an intent to terminate it.[7]  EX DE 37-1 at 2.  Therefore, as in *Meza*, "[b]ecause a member of the executive branch attested that [the] treaty remains in force," the Court must "decline to hold the treaty invalid."  *See* 693 F.3d at 1358.

---

[6] In particular, Article II, section 2, which gives the President the power to "make Treaties" with the advice and consent of the Senate, and Article II, section 3, which grants the President authority to "receive Ambassadors and other public Ministers"—when taken together with the requirement in Article II, section 3, that the President "shall take Care that the Laws be faithfully executed"—provide "explicit textual manifestations of the inherent presidential power to administer . . . the foreign policy of the United States." *Tachiona v. United States*, 386 F.3d 205, 212-13 (2d Cir. 2004) (citation omitted); *see also Made in the USA Found.*, 242 F.3d at 1313.  The authority of the Executive in the field of foreign relations is "very delicate, plenary and exclusive." *Dames & Moore*, 453 U.S. at 661 (citation omitted).

[7] In addition, the Treaty appears on the current list of treaties in force published by the Department of State.  *See* U.S. Dept. of State, List of Treaties and Other International Agreements of the United States in Force on January 1, 2017, at 89, https://www.state.gov/documents/organization/273494.pdf.

Although *Meza* is binding on this Court, many other cases also provide persuasive authority for deferring to the position of the U.S. Department of State when determining that an extradition treaty remains in force. *See, e.g.*, *Sayne v. Shipley*, 418 F.2d 679, 684 (5th Cir. 1969) (holding that Article XVI of the extradition treaty with Panama is in effect because "[t]he Assistant Legal Advisor [sic] for Treaty Affairs of the State Department has advised the District Court that Article XVI of the 1903 Treaty is still in effect . . . [and] such advice, while not conclusive on this Court, is entitled to great weight and importance"); *Sabatier v. Dabrowski*, 586 F.2d 866, 868 (1st Cir. 1978) ("The history of the relations between the two countries, the terms of the current extradition treaty, the official position of the Department of State, and the relevant rules of law all point to the conclusion that Canada should be regarded as a party to the Webster-Ashburton Treaty. . . ."); *Arambasic v. Ashcroft*, 403 F. Supp. 2d 951, 955 (D.S.D. 2005) (noting that "this Court will give substantial weight to the determination of the political departments of the Government on the issue of whether a treaty is still in effect," and relying on a declaration from an attorney adviser in the Office of the Legal Adviser for the U.S. Department of State in rejecting the fugitive's claim that the U.S.-Croatia extradition treaty had lapsed).

Deference, as mandated under *Meza*, does not violate Article III of the Constitution, as Petitioner suggests. *Cf.* HC DE 12 at 24. As an initial matter, the premise of Petitioner's argument—that "[e]xtradition proceedings are Article III proceedings," *id.* at 23—is incorrect because, as the Eleventh Circuit has stated, "[a]n extradition proceeding is not an ordinary Article III case or controversy." *Martin*, 993 F.2d at 828.[8] Petitioner is also incorrect that extradition

---

[8] *See also, e.g.*, *Lo Duca v. United States*, 93 F.3d 1100, 1108 (2d Cir. 1996) ("[E]xtradition officers do not exercise judicial power under Article III of the Constitution."); *Matter of Requested Extradition of Smyth*, 61 F.3d 711, 720- 21 (9th Cir.), *amended sub nom. Matter of Smyth*, 73 F.3d 887 (9th Cir. 1995) ("[T]he rules of evidence and civil procedure that govern federal court proceedings heard under the authority of Article III of the United States Constitution do not apply in extradition hearings that are conducted under the authority of a treaty enacted pursuant to Article II."); *Howard*, 996 F.2d at 1325; *In re Extradition of Martinelli Berrocal*, No. 17-22197-Civ-TORRES, 2017 WL 3776953, *9 (S.D. Fla. Aug. 31, 2017) ("Foreign extraditions are *sui generis* in nature, neither civil nor criminal in nature and set forth their own law.") (citation and internal quotation omitted).

The decision in *In re Metzger*, 46 U.S. 176, does not support Petitioner's argument. There, the Supreme Court approved of the fact that the Executive referred the question of "[w]hether the crime charged is sufficiently proved, and comes within the treaty, . . . to the judgment of a judicial officer," and did not decide, or in any way suggest, that the judge was thereby exercising an Article

proceedings "arise under the Fourth Amendment." *Cf.* HC DE 12 at 23. Rather, the authority of the judge in an extradition proceeding is delegated by the Executive through statute (in particular, 18 U.S.C. § 3184) and a treaty entered into under Article II of the Constitution. *See Matter of Requested Extradition of Smyth*, 61 F.3d 711, 720-21 (9th Cir. 1995), *amended sub nom. Matter of Smyth*, 73 F.3d 887 (9th Cir. 1995); *Martin*, 993 F.3d at 828. While the Fourth Amendment is obviously relevant when a judge issues an arrest warrant in an extradition case, *see, e.g.*, *Eain v. Wilkes*, 641 F.2d 504, 510 n.6 (7th Cir. 1981); *In re Metzger*, 17 F. Cas. 232, 233 (S.D.N.Y. 1847), it does not govern the substance of extradition law (in the same way that it does not define the elements of U.S. criminal offenses). Similarly, while extradition judges conduct a probable cause analysis to fulfill their responsibility of determining whether the requesting country's evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention," as required by Section 3184, that does not convert the matter into an Article III proceeding.

> d.     Both Colombia and the United States Agree that the Treaty Is in Force

Although the view of the U.S. Department of State is alone sufficient to end the inquiry into whether the Treaty is in force, it is notable here that the Colombian Ministry of Foreign Affairs concurs with that view.[9] As Magistrate Judge O'Sullivan found, Colombia's official position that the Treaty is in force was provided in a diplomatic note issued by the Ministry of Foreign Affairs, which is Colombia's counterpart to the U.S. Department of State.[10] EX DE 59, at 5-6. Colombia

---

III function, as Petitioner claims. *See id.* at 188-89; *cf.* HC DE 12 at 23-24. To the contrary, the Court determined that "[t]he case under consideration was heard and decided by the district judge at his chambers, and not in court" and that the judge "exercise[d] a special authority" such that his decision was not appealable (as it would have been had the judge been exercising Article III authority). *In re Metzger*, 46 U.S. at 191.

[9] Petitioner himself conceded that "[w]hen both sides say [a treaty] is in force, then, it is in force." EX DE 53 at 7.

[10] As Magistrate Judge O'Sullivan found, the diplomatic note represents Colombia's official position. EX DE 59 at 6; *see also* EX DE 54-1 at 1 ("Because these views come from the Ministry of Foreign Affairs of Colombia and were formally transmitted via diplomatic note, the Department of State considers them to be the official views of the Government of Colombia."); U.S. Dep't of State, 5 Foreign Affairs Handbook Ex. H-611 (defining "Diplomatic Correspondence" as "[o]fficial correspondence between the agents authorized by a state to conduct its foreign relations either at home or abroad, with similarly authorized representative of foreign governments"). As such, the Court should disregard Petitioner's representations regarding unofficial statements reported in the media and elsewhere. *See* EX DE 54-1 at 1; *see also*

did not "equivocate[]" in this regard or "artfully evade[] stating that the Treaty is in force" in its diplomatic note, as Petitioner contends, HC DE 12 at 21; rather the diplomatic note clearly provides that the Treaty's "entry into force was on March 4, 1982," and the Treaty "continues currently in force . . . ."  EX DE 54-1 at 8-9.

In its diplomatic note, Colombia explained that (1) Colombia ratified the Treaty through the passage of Law No. 27; (2) the Treaty entered into force upon the exchange of instruments of ratification; and (3) the Treaty continues to be in force, as neither party has given notice of an intent to terminate it.  EX DE 54-1 at 8-9.  Given that statement, this case resembles *In re Extradition of Maurcio Pardo-Hasche*, where the U.S. District Court for the Western District of New York noted that the executive branches of both the United States and Colombia had taken the position that the Treaty was in force and, therefore, rejected the fugitive's claim that the Treaty was invalid.  No. 01-Misc.Cr.-49-A, Decision & Order, at 5-9 (W.D.N.Y. Aug. 30, 2002) (EX DE 38-1).

Colombia further explained that, contrary to Petitioner's contention, the nullification of Law No. 27 (and the subsequent law promulgated by the President in place of Law No. 27) did not invalidate the Treaty.  EX DE 54-1 at 8-9.  Rather, the effects of that nullification were "exclusively of internal nature," meaning that they were purely domestic.  *Id.* at 8.  Accordingly, Colombia internally relies on its domestic law to effect extraditions to the United States.  *Id.* at 9 ("[T]he extradition requests that the United States of America presents to Colombia . . . are processed based on the current criminal procedural law . . . ."); U.S. Sec'y of State, *Report on International Extradition Pursuant to Section 211 of Public Law 106-113, Fiscal Years 2000 and 2001*, at 9, *available at* http://www.state.gov/documents/organization/6545.doc ("Even though it has been unable to rely on the provisions of the treaty to arrest and extradite fugitives at the request of the United States, the Government of Colombia has used its domestic extradition law to extradite persons to the United States.").  This comports with the understanding of the Eleventh Circuit in *Gallo-Chamorro* that the nullification of Law No. 27 had the effect of rendering the Treaty inapplicable "*in Colombia*."  48 F.3d at 503 n.1 (emphasis added).

---

*Demirchyan v. Gonzales*, No. CV 08-3452 SVW, 2010 WL 3521784, at *4 n.7 (C.D. Cal. Sept. 8, 2010) ("A search of the caselaw reveals that diplomatic notes are used almost exclusively for purposes of obtaining extradition, *for governments to express their official legal or political positions on certain issues*, and for governments to reach informal diplomatic agreements.") (emphasis added).

The fact that the Treaty does not have self-executing domestic effect in Colombia does not mean that it is no longer in force altogether; it continues to operate on an international level.  *See Martinez*, 755 F. Supp. at 1033 ("As a result of the Colombian Supreme Court's decision, the Extradition Treaty is not domestically binding on Colombia, as it is upon the United States. Nonetheless, it appears that neither party has terminated or in any way disavowed the treaty, and hence, it remains in force under principles of international law.").  Indeed, the Supreme Court has recognized the related notion that treaties can "constitute international law commitments" even if they "do not by themselves function as binding federal law."  *Medellin v. Texas*, 552 U.S. 491, 504-05 (2008) (explaining that "while treaties may comprise international commitments . . . they are not [U.S.] domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms") (citations and internal quotation marks omitted).

According to Colombia, while requests for extradition presented by the United States may be processed pursuant to Colombia's domestic law, "requests that [Colombia] submits to the United States of America, including the extradition request of [Petitioner], are based upon and processed in accordance [with] the provisions referred in the Treaty." EX DE 54-1 at 9.  Indeed, although Colombia did not expressly reference the Treaty in its request for the extradition of Petitioner, Colombia followed the procedures set forth in the Treaty in submitting the request to the U.S. Department of State, and it provided the documents required under the Treaty.[11]  *See* Art.

---

[11] Petitioner also complains that "Colombia's complaint does not invoke this Court's jurisdiction under the Treaty." HC DE 12 at 20.  As an initial matter, as discussed below, the United States, and not Colombia, filed the Complaint in this case, and thus that document is not indicative of Colombia's view of the Treaty.  Moreover, the United States did invoke the Treaty in the Complaint, averring that "[t]here is an extradition treaty in force between the United States and the Republic of Colombia, U.S.-Colom., Sept 14, 1979, S. Treaty Doc. No. 97-8 (1981)." EX DE 1 at 1.  And in any event, there is no requirement that an extradition complaint "invoke" the Treaty.  *See, e.g.*, *In the Matter of the Extradition of Tang Yee-Chun*, 674 F. Supp. 1058, 1069 (S.D.N.Y. 1987) (rejecting fugitive's argument that extradition complaint was deficient because the "existence of a treaty, not proper reference to it, is the statutory requirement"); *see also, e.g.*, *Shapiro v. Ferrandina*, 478 F.2d 894, 899 (2d Cir. 1973) (concluding that fugitive was extraditable to Israel despite the omission in the complaint of a statement that he may be "found" within the district).  To the contrary, Section 3184 permits the filing of an extradition complaint merely "[w]henever there *is* a treaty or convention for extradition between the United States and any foreign government, *or* in cases arising under section 3181(b)." 18 U.S.C. § 3184 (emphasis added).

9 of the Treaty; EX DE 1 at 1.  The lack of an express reference to the Treaty in the request is immaterial, given that there is no requirement in the Treaty that the requesting state specifically invoke the Treaty.  Both the United States and Colombia understood that Colombia requested extradition pursuant to the Treaty.  EX DE 37-1 at 2; EX DE 54-1 at 9.

The fact that Colombia may not domestically process the United States's extradition requests pursuant to the Treaty is inapposite to the present inquiry, involving a Colombian extradition request to the United States;[12] however, it has led to some inartful dicta in the course of U.S. criminal prosecutions of defendants returned to the United States by Colombia suggesting that the Treaty is generally invalid, rather than simply being invalid domestically in Colombia. *See* HC DE 12 at 17 (citing cases).  For example, in *United States v. Valencia-Trujillo*, the Eleventh Circuit rejected the defendant's argument that "our two *Gallo-Chamorro* decisions establish that he was extradited under" the Treaty, and commented that the Treaty "was not in effect at the time the defendant in Gallo-Chamorro was extradited in 1990 [because t]he law ratifying the treaty had been struck down by Colombia's Supreme Court in 1986," 573 F.3d 1171, 1178-79 (11th Cir. 2009)—even though, as noted above, the *Gallo-Chamorro* court had expressly noted that the nullification of the ratifying legislation meant only that the Treaty lacked effect "in Colombia," 48 F.3d at 503 n.1.  Regardless, dicta such as that in *Valencia-Trujilo* is neither binding nor persuasive in this case, given that courts in cases involving defendants who were not extradited pursuant to the Treaty had no reason to delve into its validity.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) ("Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed.") (Scalia, dissenting) (collecting cases); *Pardo-Hasche*, Decision & Order, at 6-7 ("In the context of dealing with bail determinations or extraditions *from* Colombia to the United States [pursuant to Colombian domestic law], several courts have noted the lack of an enforceable extradition treaty between the United States and Colombia.  These cases are not controlling.  The existence or validity of the Extradition Treaty

---

[12] Moreover, Colombia's execution of the United States's extradition requests pursuant to its domestic law, instead of the Treaty, does not itself violate the Treaty.  *See United States v. Cordero*, 668 F.2d 32, 37-38 (1st Cir. 1981) (rejecting defendants' argument that the U.S.-Panama extradition treaty had been violated when Panama opted not to use the procedures set forth in the treaty when returning the defendants for prosecution in the United States); EX DE 54-1 at 1 (presenting the view of the United States that "the fact that Colombia's domestic law implementing the Treaty was struck down by the Colombian Supreme Court does not mean that the Government of Colombia is failing to fulfill its international legal obligation to extradite under the Treaty").

was not the central issue in those cases and the bare dicta in those opinions does not reflect a thorough analysis of the validity of the treaty or the ability to utilize it to extradite an individual *to* Colombia.") (emphasis in original; citations omitted).

      e.   <u>The United States and Colombia Have an Active Extradition Relationship</u>

Petitioner suggests, incorrectly, that the Court should decide whether the Treaty is in force based on "whether the parties show that they consider the treaty binding and have 'frequently granted [each other's extradition requests] under the treaty . . . .'"  HC DE 12 at 18 (citing *Terlinden*, 184 U.S. at 285).[13]  The Supreme Court in *Terlinden* held, "[w]e concur in the view that the question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard."  184 U.S. at 288.  There, the Court relied on *Braden* to conclude that it could not "properly intervene" to find that the U.S.-Prussia treaty had been terminated by the creation of the German Empire and the adoption of its constitution, as the fugitive contended, given "the judgment of both governments [of the United States and the German Empire] to the contrary." *Id.* at 289-90.  In explaining that the governments did not view the treaty as having been terminated, the Court noted that both the United States and Germany had continued to extradite fugitives to each other under the treaty.  Here, there is no need to attempt to divine the views of the U.S. and Colombian governments based on their conduct, given the authoritative statements they have submitted.

Regardless, their conduct in fact further suggests that the Treaty is in force.  The United States continues to submit extradition requests to Colombia and to surrender fugitives to Colombia pursuant to the Treaty (and courts continue to certify the extraditability of those fugitives, necessarily finding that the Treaty is in force in each case).  *See* EX DE 37-1 at 4; *see also, e.g.*, *In re the Matter of the Extradition of Camelo-Grillo*, No. CV 16-9026 JVS (SS), 2017 WL

---

[13] Petitioner's citation to *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006), *et al.* for the proposition that courts are empowered to interpret treaties is irrelevant here.  *Cf.* HC DE 12 at 24. Treaty interpretation (what a treaty means) and treaty ratification (whether a treaty has been formally consented to) are decidedly distinct issues, which are treated as such by the courts.  *See Franklin Mint Corp.*, 690 F.2d at 311.  Moreover, even in the area of treaty interpretation, courts look to the view of the Executive Branch.  *See, e.g.*, *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'") (citation omitted).

2945715, at *5 (C.D. Cal. July 10, 2017); *In the Matter of the Extradition of Leopoldo Hernandez-Andrade*, No. 16-mc-21470, Certification of Defendant's Extraditability and Order of Commitment, at 9 (S.D. Fla. June 6, 2016); *In the Matter of the Extradition of Carlos Mario Bedoya-Zapata*, No. 09-mc-81104, Certification of Extraditability and Order of Commitment, at 2 (S.D. Fla. Sept. 10, 2009).  Similarly, as Magistrate Judge O'Sullivan found, Colombia routinely accepts extradition requests made by the United States pursuant to the Treaty, extradites numerous fugitives (in fact, more fugitives annually than any other country) to the United States in response to those requests, and submits extradition requests to the United States with the understanding that they are based on, and will processed in accordance with, the Treaty.  EX DE 59 at 7 n.6 (citing EX DE 54-1 at 8); EX 54-1 at 8-9; *see also United States v. Mitchell*, No. 83-CR-86, 1990 WL 132573, at *7 (E.D. Wis. Sept. 10, 1990) (noting that "the executive branch of the Colombian government has cooperated with the United States on the basis of the [sic] both the treaty and the presidential decree [permitting extradition under Colombian domestic law]"); U.S. Dep't of State, Bureau for Int'l Narcotics & Law Enforcement, International Narcotics Control Strategy Report 137 (vol. 1 Mar. 2015) ("Since December 17, 1997, Colombia has extradited approximately 1,761 individuals to the United States.").

Petitioner cherry-picks a handful of cases in which Colombia has denied U.S. extradition requests and offers those in support of the notion that Colombia fails to recognize the Treaty, without any explanation as to why those denials actually represent such a failure.[14]  The requests could have been denied for any of the numerous reasons expressly authorized under the Treaty, such as where the offense is of a political character and/or punishable by death, where the statute

---

[14] Moreover, Petitioner's argument that the Treaty is not in force given recent isolated denials of U.S. extradition requests is countermanded by the fact that Colombia has also recently granted a number of U.S. extradition requests.  *See, e.g.*, Press Release, Dep't of Justice, Colombian National Extradited to the United States to Face Charges for Encouraging and Inducing Aliens to Come to the United States (Nov. 8, 2017), https://www.justice.gov/opa/pr/colombian-national-extradited-united-states-face-charges-encouraging-and-inducing-aliens-come;  Oliver Griffin, *Colombia Extradites 8 'Narcos', Including Former Venezuelan Military Official*, Colombia Reports (July 5, 2017), https://colombiareports.com/colombia-extradites-8-narcos-including-former-venezuelan-military-official/; Press Release, Dep't of Justice, International Narcotics Transporter Extradited from Colombia (May 26, 2017), https://www.justice.gov/usao-edny/pr/international-narcotics-transporter-extradited-colombia.

of limitations has run, and where the fugitive is a citizen of the requested country.[15]  *See, e.g.*, Arts. 4, 7, & 8 of the Treaty.  As Magistrate Judge O'Sullivan found, "[i]t is not out of the ordinary that a country, for a multitude of reasons, refuses an extradition request."  EX DE 59, at 7.  Thus, denials do not conclusively demonstrate that Colombia fails to recognize the Treaty.

Even if Colombia did deny U.S. extradition requests for reasons not permitted under the Treaty, such action would not invalidate the Treaty.[16]  At most, Colombia would be violating its Treaty obligations.  As the Supreme Court explained in *Charlton*, "[w]here a treaty is violated by one of the contracting parties, it rests alone with the injured party to pronounce it broken, the treaty being, in such case, not absolutely void, but voidable, at the election of the injured party . . . ."  229 U.S. at 474 (citation omitted).  There, the Supreme Court held that the extradition treaty between the United States and Italy remained in force notwithstanding Italy's refusal to surrender its own citizens because doing so violated its domestic law.  *Id.* at 476.  Petitioner's suggestion that Colombia's failure to abide by the Treaty automatically renders the Treaty void is nonsensical and, if adopted, could have sweeping implications for all of the United States's treaty relationships, as it would mean that our partners could terminate their treaty obligations simply by failing to comply with them.

---

[15] For example, according to the news article provided by Petitioner, Colombia denied the United States's request for the extradition of drug kingpin Walid Makled because Venezuela had submitted an earlier request for his extradition.  EX DE 56-1 at 2.  Such a denial may be expressly permitted under Article 14 of the Treaty, which allows "[t]he Executive Authority of the Requested State, upon receiving requests from the other Contracting Party and from a third State . . . for the extradition of the same person . . . [to] determine to which of the Requesting States it will extradite that person."  Petitioner also neglects to mention that the Supreme Court of Colombia approved Makled's extradition to the United States and Venezuela.  Ultimately, the Colombian President exercised his executive discretion to extradite Makled to Venezuela.

[16] Indeed, some of the United States's strongest treaty partners occasionally deny extradition.  *See, e.g.*, Nate Raymond, *Ex-Swiss Banker Goes Home After U.S. Loses Extradition from Germany*, Reuters News, Dec. 9, 2016, 12:06 PM; Matthew Day, *Poland Refuses to Extradite Polanski to US*, Daily Telegraph, Dec. 7, 2016, at 15; *Gary McKinnon Extradition to US Blocked by Theresa May*, BBC News, Oct. 16, 2012.

### 2. Neither the Act-of-State Doctrine Nor Political-Question Doctrine Deprived the Extradition Court of Jurisdiction Over the Proceeding Below

Petitioner argues that Magistrate Judge O'Sullivan failed to observe two limits on Article III power: the act-of-state doctrine and the political-question doctrine.[17]  *See* HC DE 12 at 30, 34. In particular, he argues that those doctrines barred Magistrate Judge O'Sullivan from considering whether the distribution of AIS subsidies was improper and whether the designation of the Agreements as "scientific and technical" was false.  *See id.*  The premise of his argument fails *ab initio* because, as discussed above, an extradition is not an Article III proceeding.  *See supra* at 17 & n.8.

But even if it were, Petitioner's arguments are meritless.  Both the act-of-state doctrine and the political-question doctrine arise out of separation-of-powers considerations, which guide courts in determining whether to show restraint in favor of the expertise of another branch of the government when managing international relations and handling "political questions."  *See, e.g.*, *Aktepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997); *Jimenez v. Aristeguieta*, 311 F.2d 547, 558 (5th Cir. 1962).  The former "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  The latter "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" by the executive and legislative branches of government. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Although they are related, they are different in that the political-question doctrine provides a "defense to justiciability," while the act-of-state doctrine provides a "substantive defense on the merits," *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 52 n.9 (D.D.C. 2010).  Neither applies in this case.

---

[17] In the proceeding below, Petitioner did not argue that the doctrines posed a bar to jurisdiction.  Rather, he failed to explain exactly how they bore on his extraditability, though he discussed them primarily in the context of dual criminality.  *See* EX DE 85 at 41-54.  Magistrate Judge O'Sullivan found that the doctrines "do not prevent a finding of dual criminality" because "[t]he dual criminality requirement does not consider possible affirmative defenses or procedural rules that would bar prosecution by the requesting or requested party."  Certification at 15 (internal quotation marks and citation omitted).

As an initial matter, there is no act of state or political question involved in this extradition proceeding.  Act-of-state immunity does not attach to criminal acts an official commits for his private political benefit.[18]  *See Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012) (foreign official immunity is not available "for private acts that are not arguably attributable to the state, such as drug possession or fraud"); *Jimenez*, 311 F.2d at 558  (acts of embezzlement by former Venezuelan president were not acts of state because they were "common crimes committed by the Chief of State done in violation of his position and not in pursuance of it"); *United States v. Emmanuel*, No. 06-20758-CR, 2007 WL 2002452, at *14 (S.D. Fla. July 5, 2007) (torture allegedly committed by the son of the Liberian president who was empowered to command Liberian forces, although "made possible because the wrongdoer is clothed with authority of law, are insufficient to constitute allegations of sovereignty"); *see also United States v. Noriega*, 746 F. Supp. 1506, 1521-22 (S.D. Fla. 1990) (noting that the distinction between public and private acts of government officials "has not prevented courts from scrutinizing the character of the conduct in question"), *aff'd*, 117 F.3d 1206 (11th Cir. 1997).  Similarly, the fact that Petitioner was a public official at the relevant time period does not convert the evaluation of his criminality into a non-justiciable political question.  *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) ("Our courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law. . . . [T]he latter acts are as adjudicable and redressable as would be a dictator's act of rape.") (internal citations omitted); *Republic of Philippines v. Westinghouse Electric Corp.*, 774 F. Supp. 1438, 1464-65 (D.N.J. 1991) (rejecting argument that evaluation of Filipino criminal statutes prohibiting "bribery, graft, and other forms of corruption" created a "political question" lacking "judicially discoverable and manageable standards").

---

[18] In addition, U.S. courts avoid "adjudicat[ing] the validity of an act of a foreign government under its own law" because doing so "would imperil the amicable relations between governments and vex the peace of nations."  *Jimenez*, 311 F.2d at 558 (citation and internal quotation marks omitted).  Such policy considerations are not at play where, as here, the U.S. Executive Branch "has manifested its desire that the judiciary act and decide [an extradition] case on its merits."  *See id.*; *see also In re Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d 817, 832 n.23 (11th Cir. 1984) ("[W]hen the executive branch of our Government announces that it does not oppose inquiry by American courts into the legality of foreign acts, an exception to the judicial abnegation required by the act of state doctrine has arisen.") (citation and quotation omitted).  Accordingly, the doctrine does not apply in this extradition.  *See Jimenez*, 311 F.2d at 558.

26

Moreover, Magistrate Judge O'Sullivan did not need to consider whether the Agreements were correctly designated or the subsides properly distributed at all because, as discussed above, the Supreme Court of Colombia already decided those questions in the negative.  This Court must take those findings as true.  *See In the Matter of the Extradition of Martinelli Berrocal*, No. 17-22197, 2017 WL 3776953, at *35 (S.D. Fla. Aug. 31, 2017) ("[C]ourts must accept as true all of the statements and offers of proof by the demanding state . . . .") (citation and internal quotation marks omitted).[19]  Thus, it is not a U.S. court that is sitting in judgment of Petitioner's actions, as Petitioner suggests; that role was already properly fulfilled by the Supreme Court of Colombia. Indeed, Magistrate Judge O'Sullivan's findings with respect to the designation of the Agreements and the distribution of subsidies were based on the decision of that court.  *See* Certification at 10-12, 16.

Regardless, even if there were a political question or act of state at issue, Petitioner is prohibited from invoking the doctrines as an affirmative defense in an extradition proceeding.[20] *See, e.g.*, *DeSilva v. DiLeonardi, 125 F.3d 1110, 1112 (7th Cir. 1997)* ("Affirmative defenses not specified in the treaty may not be considered."); *Martinelli Berrocal*, 263 F. Supp. 3d at 1295 ("Immunity is a defense Pres. Martinelli may raise if he is tried in Panama, but it is not relevant at this stage.").  Indeed, the government is unaware of any case in which the act-of-state doctrine or the political-question doctrine has been successfully raised to defeat extradition.

---

[19] *See also, e.g.*,  *In re Solis*, 402 F. Supp. 2d 1128, 1131-32 (C.D. Cal. 2005); *In re Lukes*, No. 2:02-MC-23-FTM, 2003 WL 23892681, at *4 n.6 (M.D. Fla. May 8, 2003); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997); *In re Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); *Ahmad v. Wigen*, 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990); *In re Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989) (citing *Collins*, 259 U.S. at 315-16).

[20] Because the political-question and act-of-state doctrines do not go to the merits of the Colombian charges, and because Petitioner attempts to raise them as an excuse to avoid extradition, they are properly viewed as affirmative defenses. *See, e.g.*, *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014) (labeling act-of-state doctrine an affirmative defense to civil *in rem* forfeiture action); *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 388 F. Supp. 649, 664 (D. Me. 1976) (labeling political-question doctrine an affirmative defense in land-related dispute between Indian tribe and government actors).

### 3.  The Complaint Was Properly Brought and Executed by the United States

Under the extradition statute, an extradition complaint must be "made under oath, charging [the fugitive] with having committed within the jurisdiction of [a] foreign government any of the crimes provided for by [the extradition] treaty or convention [between the United States and that foreign government]."  18 U.S.C. § 3184.  Even though neither the plain language of Section 3184 nor the Treaty specifies who may (or must) swear to the complaint, Petitioner insists, as he did in the proceeding below, that an official of the requesting country (Colombia in this case) must do so.  HC DE 12 at 25.  Magistrate Judge O'Sullivan properly rejected this argument, finding it sufficient that the undersigned Assistant U.S. Attorney swore before the Court on August 11, 2016, that, according to the information provided in the extradition request, Colombia seeks the extradition of Petitioner.  *See* Certification at 5-6; EX DE 1.

It is generally the practice in the United States that Assistant U.S. Attorneys file extradition complaints in their capacity representing the United States. [21]  *See Eain*, 641 F.2d at 508 (explaining that after a foreign country has submitted an extradition request that has been approved by the U.S. Department of State, "[t]he United States Attorney may then file a complaint and seek an arrest warrant from a magistrate"); U.S. Attorney's Manual, Crim. Res. Manual § 614 (Feb. 2007), https://www.justice.gov/usam/criminal-resource-manual-614-procedure-district-court ("Although extradition cases are initiated in response to a foreign government's treaty request, the client of the prosecutor in these cases is the United States and not the foreign government. The prosecutor, when appearing in court in support of the request for extradition, is representing the United States in fulfilling its obligations under the extradition treaty.").

---

[21] The Treaty requires that the United States "provide for legal representation *to protect the interests of* [Colombia] before the competent authorities of the [United States]," and does not provide for representation *of* Colombia in U.S. courts.  Treaty, art. 9(7) (emphasis added).  Indeed, the United States initiated this proceeding to obtain a certification of Petitioner's extraditability pursuant to its treaty obligation to extradite fugitives to Colombia.  *See* Certification at 6 ("The United States is representing the interests of the government of Colombia in the instant proceedings pursuant to a valid Treaty and pursuant to section 3184.").  Accordingly, Petitioner inaccurately refers to actions taken by "Colombia" in this proceeding in his Petition.  *Cf., e.g.*, HC DE 12 at 16 (referring to what "Colombia claimed" in the Complaint in this case); *id.* at 20 (discussing statements made by "Colombia's counsel" at a hearing before Magistrate Judge O'Sullivan).

Moreover, "[t]he question of whether an Assistant United States Attorney is a proper party to initiate [extradition] proceedings along with the question of whether his knowledge gained through diplomatic channels is a sufficient basis to support a complaint has long been settled in the affirmative by the Supreme Court." *United States ex rel. Petrushansky v. Marasco*, 215 F. Supp. 953, 957 (S.D.N.Y. 1963). In particular, when rejecting a fugitive's argument that the extradition complaint was defective, the Supreme Court in *Fernandez* explained:

> The complaint was filed by an Assistant District Attorney of the United States for the District of New Hampshire. It alleged that the complaint was informed 'through diplomatic channel' that the [fugitive] was duly and legally charged by the United States of Mexico with the crime, and on behalf of that government prayed the arrest. Of course whatever form of words was used, the complaint necessarily was upon information, but as appeared at the hearing it was filed by order of the Attorney General, upon request of the Secretary of State, enclosing a request for the extradition from the Mexican Government and a copy of proceedings in a Mexican Court finding that the crime was duly proved against the [fugitive] and ordering his arrest, many pages of evidence being appended. This was enough.

268 U.S. at 312-13.

None of the cases cited by Petitioner are to the contrary. *See* HC DE 12 at 26-27. Those cases originate from archaic extradition practice, where representatives of foreign governments often appeared before U.S. courts and swore out the complaints themselves (although the extradition statute in force at that time did not limit that authority to such representatives). *See Grin v. Shine*, 187 U.S. 181, 193 (1902) (holding that R.S. Sec. § 5270, the pre-1940 U.S. extradition statute, authorized "any person making a complaint under oath and acting by the permission or authority of the [foreign] government" to initiate extradition proceedings). The cases cited by Petitioner approve of that practice, but in no way indicate that that is the only accepted practice. *See, e.g.*, *Yordi v. Nolte*, 215 U.S. 227, 231-33 (1909) (affirming denial of *habeas corpus* petition, and noting that "the evidence produced at the hearing justified the detention of the [fugitive] and corrected any irregularity in the complaint [which had been sworn to by a Mexican consul]"); *Grin*, 187 U.S. at 193 (rejecting the fugitive's challenge to the authority of the Russian consul who swore to the extradition complaint, and holding that the complaint "*may* be made by any person acting under the authority of the foreign government, having knowledge of the facts, or, in the absence of such person, by the official representative of the foreign government, based upon depositions in his possession") (emphasis added); *Rice v. Ames*, 180 U.S. 371, 407-08 (1901) (affirming denial of *habeas corpus* petition in an extradition proceeding

initiated by a complaint sworn to by a representative of the Canadian government, noting that "[t]he ordinary course is to send an officer or agent of the [foreign] government" to swear out a complaint, and holding that extradition complaints do not need to be "sworn to by persons having actual knowledge of the offense charged"). Thus, contrary to Petitioner's argument, an Assistant U.S. Attorney may attest to the allegations in an extradition complaint, and properly did so in this case. For the foregoing reasons, Magistrate Judge O'Sullivan properly exercised jurisdiction over the proceeding below.

C.   **The Evidence Provided by Colombia Satisfies the "Any Evidence" Standard of Review Applicable to Magistrate Judge O'Sullivan's Probable Cause Finding**

The record before Magistrate Judge O'Sullivan contained ample evidence warranting his finding that there was reasonable ground to believe that Petitioner committed the crimes of which he has been convicted. To demonstrate probable cause, the government offered, and the Court admitted and relied upon, the lengthy and detailed judgment of conviction issued by the Supreme Court of Colombia. Magistrate Judge O'Sullivan found that Petitioner's "conviction—rendered after a lengthy trial for which [he] was present and represented by counsel—meets the requirement that the Court find there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought" and that, in addition, "[t]here is substantial probable cause within the record independent of the conviction." Certification at 18 & n.9.

"[A] magistrate's probable cause finding must be upheld [on *habeas*] if there is any competent evidence in the record to support it." *Ylipelkonen v. Thornburgh*, 756 F. Supp. 570, 571 (S.D. Fla. 1991) (citing *Fernandez*, 268 U.S. at 312); *see also, e.g.*, *Manta v. Chertoff*, 518 F.3d 1134, 1144-45 (9th Cir. 2008). "Competent evidence" is generally evidence that has been properly authenticated pursuant to 18 U.S.C. § 3190 or the applicable treaty. *See Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *Manta*, 518 F.3d at 1146. Petitioner does not address the *habeas* standard of review applicable to Magistrate Judge O'Sullivan's probable cause determination. Rather, he argues that that determination improperly relied only on the Colombian judgment of conviction because, in his view, that judgment was politically motivated and the product of corruption. HC DE 12 at 35. That argument is meritless.

As an initial matter, Petitioner's argument fails to address Magistrate Judge O'Sullivan's finding that the evidence in the record—independent of the conviction—established probable

cause.  This evidence, as summarized above, more than satisfies the "any evidence" standard for upholding a fact-based probable cause determination on *habeas*.

Even if that were not the case, as a matter of law, the judgment of conviction against Petitioner conclusively establishes probable cause that he committed the two offenses at issue.  *See* Certification at 18 (explaining that "where the extraditee has been convicted by the requesting state at a trial where he was present and represented by counsel, the Court does not need to undertake an independent probable cause determination").  The case law is well developed, clear, and uniform that, where a fugitive was present at his trial, a foreign-court judgment convicting him of an extraditable offense is alone sufficient to sustain the foreign charge for purposes of a certification of extraditability.[22]  Any contrary rule would contradict the Treaty, which, in the case

---

[22] *See, e.g.*, *Sidali v. I.N.S.*, 107 F.3d 191, 196 (3d Cir. 1997) ("[A] foreign conviction obtained after a trial at which the accused is present is sufficient to support a finding of probable cause for the purposes of extradition."); *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) ("[Where] there has been a judgment of conviction [entered by a foreign court], there is no need for an 'independent' determination of probable cause: the relator's guilt is an adjudicated fact which *a fortiori* establishes probable cause."); *In re Extradition of Mejuto*, No. 14-M-515, 2014 WL 2710948, at *2 (E.D. Pa. June 13, 2014) ("When a prior conviction is at issue, a court's probable cause determination may be based solely upon the existence of a judgment of conviction in the requesting country."); *In re Extradition of Hughes*, No. 12-1831-JGB MLG, 2013 WL 1124294, at *6 (C.D. Cal. Mar. 18, 2013) ("Where, as here, the fugitive has already been convicted, the conviction is dispositive of the issue of probable cause."); *Soares v. Hendricks*, No. 11-7134 JLL, 2012 WL 161747, at *2 (D.N.J. Jan. 19, 2012) ("The threshold for establishing probable cause in extradition cases is even lower where a fugitive has already been convicted by the requesting country.  A judgment of conviction is all that is necessary for a Court to determine that probable cause exists for purposes of extradition."); *In re Extradition of Paberalius*, No. 10 M 275, 2011 WL 2144065, at *9 (N.D. Ill. May 31, 2011) ("Courts are in agreement.  'A foreign conviction obtained after a trial at which the accused is present is sufficient to support a finding of probable cause for the purposes of extradition.'") (citation omitted); *Swierzbinski v. U.S. Attorney Gen.*, No. 10-3059-RDR, 2010 WL 2484216, at *3 (D. Kan. June 14, 2010), *aff'd sub nom. Swierzbinski v. Holder*, 408 F. App'x 188 (10th Cir. 2011) ("Petitioner's conviction in Poland establishes probable cause to believe he committed the offense."); *Lindstrom v. Gilkey*, No. 98 C 5191, 1999 WL 342320, at *9 (N.D. Ill. May 14, 1999) ("[C]ertified proof of conviction for the crimes at issue in an extradition request is sufficient to establish probable cause."); *Beukes v. Pizzi*, 888 F. Supp. 465, 467 (E.D.N.Y. 1995) ("In determining whether probable cause has been established, the certifying court may rely on an adjudication of guilt by a court in the requesting country."); *United States v. Clark*, 470 F. Supp. 976, 978 (D. Vt. 1979) ("The court finds that the certified copy of respondent's Certificate of Conviction in Canada, submitted to the court, is sufficient proof that probable cause exists that the respondent has been guilty of an offense involving criminality and we hold that document satisfies the requirement that the court find

of a fugitive who has been convicted, requires the requesting state to provide nothing more about the conviction other than a copy of the judgment (along with "[e]vidence proving that the person sought is the person to whom the conviction refers").  Article 9(4) of the Treaty.  *Compare id. with* Article 9(3) of the Treaty (requiring the requesting country to provide, in the case of a fugitive wanted for prosecution, "[s]uch evidence as would provide probable cause to suspect . . . that the person sought has committed the offense for which extradition is requested").

While recognizing that well-settled case law provides that "a conviction rendered by a treaty partner's courts are ordinarily credited as a matter of comity," Petitioner seeks an exception to this rule for "when the foreign court was corrupt."  HC DE 12 at 36.  Petitioner cites no support for this unprecedented exception, and none exists.  Indeed, courts have repeatedly refused to carve out exceptions to the rule such as the one proposed by Petitioner.  In *Suyanoff v. Terrell*, No. 12-CV-05115-DLI, 2014 WL 6783678, at *6 (E.D.N.Y. Dec. 2, 2014), for example, the court rejected a fugitive's invitation that it look into the circumstances of his conviction.  There, the fugitive claimed that the foreign conviction had been obtained in violation of his right to counsel and without an interpreter.  *Id.* at *5.  The court found that "foreign convictions that were obtained following a trial at which the defendant was present and represented by counsel provide sufficient grounds upon which to establish probable cause."  *Id.* at *6.  The court explained that "'[t]o hold that such convictions do not constitute probable cause in the United States would require United States judicial officers to . . . substitute their judgment for that of foreign judges and juries.  Such an inquiry would be inconsistent with principles of comity.'"  *Id.* (quoting *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991)).  The court in *In re Knotek*, No. LACV139204BROJCG, 2016 WL 4726537, at *5 (C.D. Cal. Sept. 8, 2016), reached a similar conclusion.  In that case, the court rebuffed the fugitive's argument that probable cause was lacking where he had alleged that his conviction had been "tainted" by corruption.  *Id.*  The court concluded that, "[p]ursuant to the rule of non-inquiry, challenges to the legal processes and penal systems of a foreign country—such as

---

sufficient 'evidence of criminality' as set forth in 18 U.S.C. § 3184."); *In re Edmondson*, 352 F. Supp. 22, 24 (D. Minn. 1972) ("The court finds the certified copies of convictions in Canada to be sufficient proof that probable cause exists that respondents there have been guilty of an offense involving 'criminality' and finds these documents to satisfy the requirement that the court hear the 'evidence of criminality' as set forth in 18 U.S.C. § 3184."); Restatement (Third) of the Foreign Relations Law of the United States § 476 cmt. b (1987) ("With respect to persons whose extradition is sought after conviction in the requesting state, the requirement [of probable cause] is met by proof of the judgment of conviction and, where applicable, of sentence.").

a claim that a foreign country's legal proceedings are corrupt—cannot be considered by extradition courts." *Id*.

Notably, the exception propounded by Petitioner would impermissibly require extradition courts to stray into areas reserved for the Secretary of State.   In particular, pursuant to the well-established "rule of non-inquiry," extradition courts are precluded from "assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request," reserving such considerations exclusively for consideration by the U.S. Secretary of State. *Martin*, 993 F.2d at 829.[23]   Indeed, a determination that a foreign judicial system is plagued by corruption could have serious foreign-relations implications and is, therefore, properly made only by the Secretary. *See Fernandez-Pertierra*, 523 F. Supp. at 1141-42 (citing *Dames & Moore*, 453 U.S. 654, and *Haig*, 453 U.S. 280) (noting that a "long judicial tradition" supports a "general judicial policy of deference to the executive in the area of foreign relations")); *Martinelli Berrocal*, 2017 WL 3776953, at *29 ("Considerations of the level of corruption by the requesting state hence fall within the exclusive jurisdiction of the Secretary of State.").  Similarly, it is well settled that "the motives of the requesting government are irrelevant" to a court's determination of a fugitive's extraditability, and "must be addressed solely to the Secretary of State."  *Ordinola v. Hackman*, 478 F.3d 588, 604-05 (4th Cir. 2007) (rejecting fugitive's argument that the "new" government in the requesting country sought extradition as a means to punish him for being a member of the

---

[23] *See also Hilton v. Kerry*, 754 F.3d 79, 84-85 & 87 (1st Cir. 2014) (stating that the rule of non-inquiry "bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters"); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997) ("[U]nder what is called the 'rule of non-inquiry' in extradition law, courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely"); *Eain*, 641 F.2d at 516-17 (discussing sole discretion of Secretary of State to establish "an American position on the honesty and integrity of a requesting foreign government"), *cert. denied*, 454 U.S. 894 (1981); *In re Extradition of Cruz*, No. 16 CR 283, 2016 WL 6248184, at *6 (N.D. Ill. Oct. 26, 2016) (disregarding fugitive's argument that "he will not receive a fair trial in Mexico due to corruption that he says exists in the Mexican judiciary"); *Knotek*, 2016 WL 4726537, at *5 (disregarding fugitive's argument that the foreign prosecution was "tainted by corruption," and noting that "[p]ursuant to the rule of non-inquiry, challenges to the legal processes and penal systems of a foreign country—such as a claim that a foreign country's legal proceedings are corrupt—cannot be considered by extradition courts").

"old" government).[24]   Accordingly, any allegations of the political or corrupt nature of Petitioner's conviction are irrelevant to the probable cause determination in this case.[25]

Petitioner's suggestion that principles of comity do not apply where a fugitive alleges the foreign court was corrupt, *see* HC DE 12 at 36, turns those principles on their head.  Those well-founded principles require that U.S. courts decline "to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation" and, thus, prohibit consideration of allegations of corruption.  *Jhirad*, 536 F.2d at 484-85; *see also, e.g.*, *Koskotas v. Roche*, 931 F.2d 169, 174 (1st Cir. 1991) ("Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."); *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990) ("The interests of international comity are ill-served by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced.").  Accordingly, the Court should reject Petitioner's misplaced attempt to challenge the finding of probable cause in this case.

### D.   The Crimes With Which Petitioner Has Been Convicted Are Extraditable Under the Treaty

#### 1.   Relevant Background

Article 1 of the Treaty provides for the return of fugitives charged with or convicted of an "extraditable offense."   Article 2 of the Treaty defines offenses as extraditable if they are: (a)

---

[24] *See also, e.g.*, *Barapind v. Enomoto*, 360 F.3d 1061, 1077 (9th Cir. 2004) ("India's motivations for requesting the extradition are properly left to the Executive Branch."); *Eain*, 641 F.2d at 516 ("[E]valuations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion."), *cert. denied*, 454 U.S. 894 (1981); *Marzook*, 924 F. Supp. at 578 ("[T]he political motivation of the prosecution is not a business in which this court may delve."); *In re Extradition of Pazienza*, 619 F. Supp. 611, 621 (S.D.N.Y. 1985) (relying on "the longstanding rule of 'non-inquiry' under which United States courts generally defer to the State Department on questions of whether the requesting State's motive is political"); *In re Locatelli*, 468 F. Supp. 568, 575 (S.D.N.Y. 1979) (rejecting fugitive's argument that criminal charges were motivated by revenge, and noting that "I am simply without jurisdiction to look behind the charges as propounded by the Swiss Government and must, in this respect, yield this inquiry to the Secretary of State").

[25] Furthermore, the judgment does not appear to have been tainted by politics or corruption. Indeed, Petitioner was partially acquitted, as the Supreme Court of Colombia found that he committed embezzlement by diverting funds to the eleven families, but "absolve[d]" him of committing embezzlement by diverting funds to IICA.  Conviction at 193.

"Offenses described in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties" by a "deprivation of liberty for a period exceeding one year"; or (b) "Offenses, whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States and the laws of the Republic of Colombia" by a "deprivation of liberty for a period exceeding one year." The Treaty's Schedule of Offenses expressly lists Fraud and Embezzlement as potentially extraditable offenses. Appendix to Treaty, Sections 10 & 11. The dual criminality requirement is satisfied when the description of criminal conduct provided by the requesting country in support of its charges would have been criminal under the laws of the requested country if it had been committed in analogous circumstances there. *See Ordinola*, 478 F. 3d at 594 n.7.

As described below, Petitioner attempts to re-litigate why certain elements of the applicable U.S. statutes upon which dual criminality may be based are not supported by the record, but Magistrate Judge O'Sullivan properly rejected those arguments. An examination of the conduct described in the documents provided by Colombia establishes that the offenses for which Petitioner was convicted satisfy the dual criminality requirement and are, therefore, encompassed by the Treaty.

### 2.     18 U.S.C. § 641 Criminalizes the Conduct Underlying Petitioner's Conviction for Embezzlement for Third Parties

In the proceeding below, the government argued, and Magistrate Judge O'Sullivan found, that the conduct underlying Petitioner's conviction for Embezzlement for Third Parties, which carries a maximum punishment of fifteen years' imprisonment in Colombia, would be punishable as embezzlement in violation of 18 U.S.C. § 641, which carries a maximum punishment of ten years' imprisonment (where the sum of the value of the property is greater than $1,000), if it had been committed here.[26] Certification at 12. The elements required for a conviction under Section 641 are as follows: (1) the money described in the indictment belonged to the United States; (2) the defendant embezzled, stole, or knowingly converted the money to his own use or to someone

---

[26] The conduct would alternatively be punishable under 18 U.S.C § 666 (a)(1)(A). Petitioner's embezzlement of funds from a government program is covered by that statute for substantially the same reasons that it is covered by Section 641. *See, e.g.*, *United States v. Sanderson*, 966 F.2d 184, 188 (6th Cir. 1992) ("Thus it seems that Congress intended section 666 to augment the general theft statute of section 641. Accordingly, we look at section 641 and its applicability to prosecutions for multiple actus reus elements.").

else's use; (3) the defendant knowingly and willfully intended to deprive the United States of the use or benefit of the money; and (4) the money had a value greater than $1,000.[27]  *See* Eleventh Circuit Pattern Jury Instructions (Criminal) (hereinafter "Pattern"), Offense Instruction No. 21 (2016); *see also, e.g.*, *United States v. McRee*, 7 F.3d 976, 980 (11th Cir. 1993).  Petitioner's conduct would satisfy each of those elements if it had been committed here.

*First*, the money for the irrigation and drainage projects belonged to Colombia and, therefore, under analogous circumstances, would have belonged to the United States.  *See* Certification at 11, 13.

*Second*, Petitioner diverted that money, which was required to be used for the purpose of "reduc[ing] inequality [in] rural areas," to eleven families through allocations that were fraudulent and in violation of Colombian law.  *See id.* at 9, 11, 13.  This action amounted to "embezzlement," which is defined as "wrongfully or intentionally tak[ing] someone else's money or property after lawfully taking possession or control of it."  Pattern Offense Instruction 21; *see also McRee*, 7 F.3d at 980 (describing second element as "fraudulently appropriat[ing] the money or property to his own use or the use of others").

*Third*, Petitioner knowingly and willfully deprived Colombia of the subsidies that were illegally misdirected to the eleven families.  *See* Certification at 11-13.

*Fourth*, Petitioner's multi-million dollar embezzlement, *see id.* at 11, 13, is far in excess of Section 641's $1,000 threshold.

Petitioner contends that he could not be convicted of a Section 641 violation because "Colombia only claimed that [he] did not close a loophole to prevent other people from potentially committing fraud."  HC DE 12 at 40.  Magistrate Judge O'Sullivan disagreed, finding that "[t]he Colombian Supreme Court found that [Petitioner] acted willfully based on its review of the evidence" and that "[g]iven the limited nature of extradition proceedings, this Court cannot re-weigh the evidence and supplant the factual findings of the Supreme Court of Colombia."  Certification at 14 (citations omitted).  In particular, Magistrate Judge O'Sullivan stated that:

---

[27] Section 641 reads in part: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both . . . ."

> [T]he Supreme Court of Colombia found that [Petitioner] did more than fail to prevent the eleven families from obtaining a disproportionate share of funds earmarked for the implementation of irrigation projects.  The Supreme Court of Colombia's opinion details how [Petitioner's] conduct facilitated the embezzlement of government funds by allowing the fictitious subdivision of property, the allocation of delivery of identical or successive requests for proposals from the same family or business groups and permitting the reclassification of previously rejected requests for proposals which did not meet technical requirements.

*Id.* at 13.  Indeed, the Supreme Court of Colombia rejected Petitioner's argument that he did no more than passively permit fraud, determining, for example, that Petitioner "controlled and arranged the management of the resources of the RFP," Conviction at 164, and that he "gave orders or took the decision" that allowed subsidies to be directed "to those beneficiaries whom he wished to favor," *id.* at 167 (emphasis added).  These factual findings, which were based on extensive witness testimony and documentary evidence, support the applicability of Section 641 to Petitioner's conduct.  *See, e.g.*, *United States v. Eagleman*, Nos. 88-3071, 88-3088, 1989 WL 52630, at *1 (9th Cir. May 10, 1989) (unpublished) (affirming Section 641 convictions of defendants who approved benefits to ineligible member of Native American Indian tribe); *In re Necolaiciuc*, No. 2:09–mc–21, 2011 WL 798144, at *3 & 15 (M.D. Fla. Mar. 1, 2011) (in extradition proceeding, applying Section 641 where fugitive, among other things, exercised control over an procurement process and transacted with "unsuitable companies" in contravention of Romanian regulations); *Seguy v. United States*, 329 F. Supp. 2d 883, 886-87 (S.D. Tex. 2004) (in extradition proceeding, applying Section 641 where director of national oil company was charged with, among other things, abusing his authority by misapplying funds and making illegal payments, because under federal law, "it is illegal for a government official to . . . use government funds for a use other than the authorized one").

### 3.  18 U.S.C. § 1001 Criminalizes the Conduct Underlying Petitioner's Conviction for Conclusion of Contract Without Fulfilling Legal Requirements

With respect to Petitioner's conviction for Conclusion of Contract Without Fulfilling Legal Requirements, which carries a punishment of up to eighteen years' imprisonment in Colombia, the government argued, and Magistrate Judge O'Sullivan found, that the underlying conduct would be punishable as false statements in violation of 18 U.S.C. § 1001, which carries a maximum punishment of five years' imprisonment, if it had been committed here.  Certification at 16.  The elements required for a Section 1001 conviction are: (1) the defendant made the statement, or made

or used the document, as charged; (2) the statement or document was false; (3) the falsity concerned a material matter; (4) the defendant acted willfully, knowing that the statement or document was false; and (5) the false statement or false document was made or used for a matter within the jurisdiction of a department or agency of the United States.[28]   Pattern Offense Instruction No. 36.  Petitioner's conduct would satisfy each of those elements.

*First*, Petitioner made and used documents containing false statements.  He, on behalf of the Ministry, signed the Agreements, which falsely provided that their object was "scientific and technical cooperation," Certification at 9-10, 16, and he "ordered the initiation of procedures" that led to the execution of those Agreements, Conviction at 76, 113, 118.

*Second*, the representation that the Agreements were for "[t]echnical and scientific co-operation" was false.  Certification at 10, 16.  In reaching the conclusion that the Agreements did not have scientific or technical activities "as any part of their object," the Supreme Court of Colombia cited, among other things, witness testimony that Petitioner selected IICA "not to make science or technology transfers or innovation of any kind—a criterion but which was not even mentioned—but to implement an RFP designed to deliver the recently approved funds for the program to private parties."  *See id.* at 106, 120-21.[29]

*Third*, the false representations contained in the Agreements signed by Petitioner were material.  Certification at 16.  A false statement is material if it "has a natural tendency to influence or be capable of influencing the government agency or department in question."  *United States v. Lawson*, 809 F.2d 1514, 1520 (11th Cir. 1987); *see also* Pattern Offense Instruction No. 36.  Here, the Supreme Court of Colombia found that the false representations enabled Petitioner to circumvent the legally required public bidding process and to ensure public funds were disbursed to his preferred contractor, IICA.  *See* Certification at 10, 16.  A misrepresentation to the

---

[28] Section 1001 provides in relevant part: (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years . . . ."

[29] Section 1001 applies where, as here, there is a factual misrepresentation in an agreement. *See United States v. Blankenship*, 382 F.3d 1110, 1132-33 (11th Cir. 2004) (overturning Section 1001 conviction where there was "not a single false statement in any of the equipment leases").

government regarding the nature of a transaction in order to induce the government to expend funds violates Section 1001. *See, e.g.*, *United States v. Kramer*, 521 F.2d 1073, 1078-79 (10th Cir. 1975) (affirming conviction of defendant who "falsely represent[ed] in the SBA application the purposes for which the loan guaranty was to be made"); *Corcoran v. United States*, 229 F.2d 295, 299 (5th Cir. 1956) (affirming conviction of defendant for his role in the submission of false documents to a federal agency regarding the purpose of a home loan guaranty); *see also United States v. Herring, 916 F.2d 1543, 1547-48 (11th Cir.1990)* ("Herring's false statements to the Georgia Department of Labor had the intrinsic capability of influencing the Secretary of Labor in administering the federal unemployment funds.").

*Fourth*, Petitioner acted willfully.  Certification at 10, 16.  "[T]o establish a willful violation of a statute, generally 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'"  *United States v. Clay*, 832 F.3d 1259, 1308 (11th Cir. 2016) (quoting *Bryan v. United States, 524 U.S. 184, 191-92 (1998)*).  Here, the Supreme Court of Colombia found that Petitioner acted willfully, Certification at 10, 16, expressly holding that Petitioner "willingly, and knowing that he was acting illegally, departed from the legal order to process and execute the Agreements questioned," Conviction at 113.

*Fifth*, under analogous circumstances, the jurisdictional element of a Section 1001 offense would be satisfied.  Certification at 16.  "The United States Supreme Court has stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined." *Herring, 916 F.2d at 1547* (citing *United States v. Rodgers, 466 U.S. 475, 480 (1984)*).  The "primary purpose" of the jurisdictional requirement "is to identify the factor that makes the false statement an appropriate subject for federal concern."  *United States v. Yermain*, 468 U.S. 63, 68 (1984).  "A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation."  *Rodgers*, 466 U.S. at 479.  Here, the Agreements were made directly with the Ministry, and, thus, the Ministry had the power to exercise authority over them. Further, the false representations in the Agreements directly affected the Ministry from both a monetary and reputational standpoint.  Certification at 11-12; *see* Conviction at 124 (noting the "deterioration of the State's image" resulting from "[p]ublic functions [being] placed at the service of private interests—those of the Minister").

Petitioner's arguments as to why his conduct would not be criminal under Section 1001 in analogous circumstances fail.  His contention that dual criminality is not met because the

applicable Colombian statute "has no U.S. analogue" applies the wrong legal standard.  *Cf.* HC DE 12 at 39.  As Magistrate Judge O'Sullivan properly concluded, "[a] finding of dual criminality is not precluded merely because some of the elements of the offense of conclusion of contract without fulfilling legal requirements differ from the elements of section 1001."  Certification at 17.  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the *particular act* charged is criminal in both jurisdictions."  *Collins*, 259 U.S. at 312 (emphasis added); *DeSilva*, 125 F.3d at 1113 ("If the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States."); *Trifonov v. Fox*, No. C14-0366JLR, 2014 WL 3735419, at *13 (W.D. Wash. July 28, 2014) (finding that Section 1001 provided a basis for dual criminality based on false documents presented to custom officials by a fugitive who was charged with attempting to assist undocumented foreign nationals to cross the Bulgarian border).

Petitioner also makes the legally unsupported and factually misplaced claim that "a discretionary decision by the U.S. Secretary of Agriculture" could not underlie a Section 1001 violation.  *Cf.* HC DE 12 at 41.  He offers no citation in support of that claim.  *Cf. United States v. Hicks*, 619 F.2d 752, 756-58 (8th Cir. 1980) (upholding Section 1001 conviction of superintendent of an agency responsible for administering federal funds in a drought relief program who submitted false financial statements and vouchers).  "Section 1001 is necessarily couched in very broad terms to encompass the variety of deceptive practices which ingenious individuals might perpetrate upon an increasingly complex government."  *United States v. House*, 684 F.3d 1173, 1205 (11th Cir. 2012) (citation and quotation marks omitted); *see also Rodgers*, 466 U.S. at 480 (stating Section 1001 was designed to protect "myriad governmental activities"); *United States v. Stanford*, 589 F.2d 285, 297 (7th Cir. 1978) (Congress intended "that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency") (citing *United States v. Gilliland, 312 U.S. 86, 93 (1941)*).  Moreover, Petitioner incorrectly suggests that the designation of the Agreements as "scientific and technical" was discretionary; rather, it was subject to the requirements and definitions set forth in Decree 393 of 1991 and Decree 591 of 1991.  As Magistrate Judge O'Sullivan found, Petitioner may not re-litigate in this extradition proceeding the Supreme Court of Colombia's conclusion that, as a matter of Colombian

law, the object of the Agreements was not "scientific and technical," and the Agreements were improperly designated as such.  Certification at 17; *see, e.g.*, *Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) ("Surely, a foreign court's holding as to what that country's criminal law provides should not lightly be second-guessed by an American court—if it is ever reviewable.").

For similar reasons, Petitioner's invitation for this Court to undertake a due process analysis of the Colombian law governing scientific and technical activities should be rejected.  As an initial matter, the Colombian law on what constitutes "scientific and technical" activities is not overly broad; Decree 591 of 1991 expressly provides a list of activities that fall within this category. [30]  *See* Conviction at 75-76.  Regardless, it has long been the law that fugitives in extradition proceedings have no right to ensure that the requesting country adhere to the guarantees contained in the U.S. Constitution.  *Martin*, 993 F.2d at 830.  The Supreme Court in *Neely v. Henkel* established that our constitutional safeguards "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country."  180 U.S. 109, 122 (1901).  There, the Court held that "[w]hen an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States."  *Id.* at 123; *see also, e.g.*, *Lindstrom v. Gilkey*, No. 98 C 5191, 1999 WL 342320, at *12 (N.D. Ill. 1999) ("The due process clause does not apply to foreign governments, and courts are not to demand that other jurisdictions live by the specific requirements of the due process clause.").  Similarly, a Colombian citizen such as Petitioner may be found extraditable irrespective of whether his prosecution in Colombia conforms to U.S. constitutional requirements.  *See, e.g.*, *Prushinowski v. Samples*, 734 F.2d 1016, 1018 (4th Cir. 1984) ("It is established that constitutional questions of deprivation of rights are addressed only to the acts of the United States Government and not to those of a foreign nation, at least for purposes of determining questions of extraditability.").

---

[30] Petitioner complains that Colombia's extradition request includes only a partial translation of Decree 591 of 1991 because the complete list of "scientific and technical" activities set forth in that statute was not included.  The complete list appears in the Supreme Court of Colombia's judgment.  *See* Conviction at 75-76.

Accordingly, Petitioner's attempts to explain why the Colombian offenses fall outside the Treaty are unavailing.

### 4. Any Ambiguity as to Whether the Crimes Are Extraditable Must Be Resolved in Favor of Extradition

To the extent there is any ambiguity regarding whether the two offenses for which Petitioner has been convicted are within the Treaty, the Court is bound by the general canon of extradition law requiring that extradition treaties must be construed liberally in favor of extradition.  As the Supreme Court articulated in *Factor v. Laubenheimer*, "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."  290 U.S. 276, 293-94 (1933).  At least five U.S. courts of appeals, along with the U.S. District Court for the Southern District of Florida, have observed that *Factor* demands that ambiguities in an extradition treaty must be construed in favor of the state signatories—that is, in favor of surrendering a fugitive to the requesting country.  *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc); *Nezirovic v. Holt*, 779 F.3d 233, 239 (4th Cir. 2015); *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997); *Ludecke v. U.S. Marshal*, 15 F.3d 496, 498 (5th Cir. 1994); *United States v. Wiebe*, 733 F.2d 549, 554 (8th Cir. 1984); *see also, e.g.*, Certification at 3 & n.3; *Martinelli*, 2017 WL 3776953, at *12; *In re Extradition of Nunez*, No. 10-24020-MC, 2011 WL 1135011, at *1 (S.D. Fla. Mar. 28, 2011).  Thus, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin*, 187 U.S. at 184, the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

### E. Magistrate Judge O'Sullivan's Decision to Quash Petitioner's Subpoenas Comported with Due Process

Petitioner makes the sweeping and meritless claim that Magistrate Judge O'Sullivan denied his right to due process when he quashed the subpoenas that Petitioner had issued *sua sponte* seeking testimony from four Department of State officials.[31]  This claim fails at the outset, as it

---

[31] Petitioner bases his due process claim on the fact that he was prevented from obtaining testimony from his subpoenaed witnesses, and not that he was prevented from obtaining the subpoenaed documents.  Accordingly, the latter is not addressed herein; however, the government reserves the right to argue, as it did below, that Petitioner was not entitled to the documents he subpoenaed, and that the subpoenas were unreasonable and oppressive.

falls outside the scope of *habeas* review because the "wrongful exclusion of specific pieces of evidence, however important, does not render [a fugitive's] detention illegal." *Collins*, 259 U.S. at 316; *see also Charlton*, 229 U.S. at 457 ("Mere errors in the rejection of evidence are not subject to review by a writ of habeas corpus."). Indeed, the extent to which a fugitive may offer evidence at an extradition hearing is within the discretion of the judge. *See, e.g.*, *Koskotas*, 931 F.2d at 175; *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999). The government is aware of no case in which a court has granted *habeas* relief based on an argument such as the one Petitioner advances.

Petitioner's claim also fails for the independent reason that his subpoenas were not properly issued. Petitioner issued them using "Form AO 89—Subpoena in a Criminal Case," and thereby pursuant to Federal Rule of Criminal Procedure 17, *see* EX DE 99-1, but the Federal Rules of Criminal Procedure do not apply to extradition proceedings, *see* Fed. Rule Crim. P. 1(a)(5)(A). Accordingly, Petitioner lacked authority to issue subpoenas in this case pursuant to those Rules.

Furthermore, Petitioner cites no support for the notion that due process provides a fugitive with the right to subpoena testimony at an extradition hearing—nor does any exist. While a fugitive has certain due process rights in an extradition proceeding, those rights are limited, as extradition proceedings do not involve a determination of guilt or innocence. *See Sayne*, 418 F.2d at 685; *Atuar v. United States*, 156 F. App'x 555, 562 (4th Cir. 2005); *see also, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (no right to confront accusers); *Yapp*, 26 F.3d at 1565 (no right to a speedy trial, under either the Sixth Amendment or Fifth Amendment Due Process Clause); *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1282-83 (S.D. Fla. 2011) (no right to cross-examination); *In re Extradition of Koskotas*, 127 F.R.D. 13, 27 (D. Mass. 1989) (no right to discovery; noting that "[c]ourts have expressly held that *Brady* principles do not pertain to extradition hearings"). A fugitive is prohibited from introducing evidence that contradicts the evidence submitted on behalf of the requesting country or which goes to his defense. *See Charlton*, 229 U.S. at 461-62; *Jimenez*, 311 F.2d at 556-57; *Schmeer v. Warden of Santa Rosa County Jail*, No. 14-cv-285, 2014 WL 5430310, at *4 (N.D. Fla. Oct. 22, 2014). Although a fugitive "can present evidence tending to explain or clarify the proof" submitted by the requesting country, *Cheng Na–Yuet v. Hueston*, 734 F. Supp. 988, 995 (S.D. Fla. 1990), "[t]here is no authority that exists that requires a magistrate judge to authorize compelled disclosures of explanatory information," *In re Extradition of Mainero*, 990 F. Supp. 1208, 1222 n.33 (S.D. Cal. 1997); *see*

*also Peryea v. United State*s, 782 F. Supp. 937, 939-40 (D. Vt. 1991) (same); *Gill v. Imundi*, 747 F. Supp. 1028, 1040 (S.D.N.Y. 1990) (same).

Even if Petitioner had a due process right to present explanatory evidence, his subpoenas did not seek such evidence.  Petitioner would interpret "explanatory" evidence as that "which provides context for the requesting state's evidence in support of extradition," HC DE 12 at 42 (citing *Santos v. Thomas*, 830 F.3d 987, 992 (9th Cir. 2016)), but no case law supports that interpretation.  Rather, the body of extradition case law has long established that the definition of "explanatory" evidence is not as broad as Petitioner wishes it to be.  *See Jimenez*, 311 F.2d at 556 ("The accused . . . may offer *limited* evidence to explain elements in the case against him . . .") (emphasis added).  It includes only evidence that goes to "explain" *the facts* (*i.e.*, the accused's charged conduct) at issue in the crime alleged by the requesting country.[32]  *See, e.g.*, *Santos*, 830 F.3d at 992 ("[W]e have generally settled on the principle that *'explanatory' evidence is evidence that explains away or completely obliterates probable cause*, whereas contradictory evidence is that which merely controverts the existence of probable cause, or raises a defense.") (emphasis added; internal quotation marks and citation omitted); *In re Extradition of Batchelder*, 494 F. Supp. 2d 1302, 1306 (N.D. Fla. 2007) ("Explanatory evidence is evidence rebutting probable cause, not evidence in defense."); *In re Extradition of Cervantes Valles*, 268 F. Supp. 2d 758, 772 (S.D. Tex. 2003) ("Explanatory evidence, then, is taken to mean evidence that provides an innocent explanation for the matters which the government contends point toward guilt."); *In re Extradition of Glantz*, No. 94 Crim. Misc. 1 P. 25, 1995 WL 495644, at *13 (S.D.N.Y. 1995) (fugitive is "limited to attempting to offer a benign explanation of the evidence presented against him").

None of the subpoenaed testimony would explain the facts underlying Petitioner's conviction.  Petitioner concedes that he sought Mr. Heinemann's testimony on the unrelated issue of the basis for the Department of State's view that the Treaty is in force.  *See* HC DE 12 at 42-45. He also concedes that he sought the three former embassy employees' testimony on the issue of

---

[32] In the context of a post-conviction extradition request, any "explanatory" evidence is likely irrelevant.  Whether a foreign conviction replaces the need for an extradition magistrate to find probable cause, *see, e.g.*, *Spatola*, 925 F.2d at 618, or simply provides a sufficient basis for the extradition magistrate's probable cause finding, *see, e.g.*, *Beukes*, 888 F. Supp. at 467, the facts of the case cannot benefit from further explanation by the fugitive.  *See In re Extradition of Suyanoff*, No. 12-MJ-462 (JMA), 2012 WL 4328523, at *4-5 (E.D.N.Y. Sept. 20, 2012) (fugitive's attempt to "explain away" his foreign convictions by arguing violations of his Brazilian rights were "irrelevant" because his arguments were considered and rejected by a Brazilian appellate court).

whether the Supreme Court of Colombia was "politicized and corrupt" such that Magistrate Judge O'Sullivan "could not credit [its] factual findings."  *See id.*  There is no case law that has classified evidence that goes to impugn a foreign court, or to attack the motive behind or credibility of its submissions, as "explanatory."   To the contrary, case law generally recognizes that extradition proceedings are ill-suited to weigh disputed facts based on credibility or other determinations, which are better made at trial.   *See, e.g.*, *Eain*, 641 F.2d at 511 ("An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof.").  And, as discussed above, an extradition magistrate is bound to credit submissions of the requesting country as true. *See supra* at 27 & n.19.  Petitioner sought to use the embassy personnel subpoenas to go even beyond an examination of the truth of the foreign submissions; he sought to have the extradition court examine the fairness of Colombia's judicial system.  Magistrate Judge O'Sullivan properly refused to do so.  *See Munaf v. Geren*, 553 U.S. 674, 700-01 (2008) ("[I]t is for the political branches, not the judiciary, to assess practices in foreign countries . . ."); *Kin-Hong*, 110 F.3d at 110 ("Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system[.]") (citation and internal quotation mark omitted); *Jhirad*, 536 F.2d at 484-85.

As Magistrate Judge O'Sullivan properly found, the subpoenaed evidence was not relevant to the issues before him.  *See EX DE 107 at 1-3*.  Although Petitioner suggests that Mr. Heinemann's testimony was necessary to determine "what weight, if any" to accord the declarations attesting that the Treaty is in force, HC DE 12 at 43, case law provides that such declarations, standing alone, are "entitled to great weight."  *See, e.g.*, *Sayne*, 418 F.2d at 684 & n.13; *see supra* at 16-17.  Although Petitioner suggests that the testimony of former embassy personnel regarding their awareness of the criminal case against him was relevant to the weight Magistrate Judge O'Sullivan should have given to the Colombian judgement of conviction, as explained above, no support exists for that argument.  *See supra* at 31-34.  Moreover, when the Department of State decided to act on Colombia's request for Petitioner's extradition, it concluded that the evidence submitted in support of the request was valid and sufficient to proceed.  Because questioning its employees on an issue already decided by the Department of State would not "explain" the evidence before the Court, it is irrelevant.  *See In re Mazur*, 2007 WL 839982, at *8 (concluding that the testimony of a Department of State official, who may have initially questioned

the strength of the case against the fugitive, was irrelevant in an extradition proceeding because the Department ultimately did decide to move forward with the case).  Accordingly, the decision to quash Petitioner's subpoenas did not violate any right to due process and does not entitle him to *habeas* relief. [33]

## III.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Petitioner's petition for a writ of *habeas corpus*.


Dated: January 22, 2018                              Respectfully submitted,

                                                     BENJAMIN G. GREENBERG
                                                     UNITED STATES ATTORNEY

                                                     /s/ *Robert J. Emery*
                                                     ROBERT J. EMERY
                                                     Assistant United States Attorney
                                                     Court ID No. A5501892
                                                     99 Northeast 4th Street
                                                     Miami, Florida 33132-2111
                                                     Tel: (305) 961-9421
                                                     Fax: (305) 536-4651

---

[33] *Accord In re Mazur*, No. 06 M 295, 2007 WL 839982, at *8 (N.D. Ill. Mar. 15, 2007) (denying fugitive's request for authorization to issue subpoenas to Department of State official because his testimony would "do[] nothing to explain the evidence ultimately presented in the extradition complaint"); *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003) (explaining that "the court shall exclude evidence that is proffered to contradict testimony, challenge the credibility of witnesses, or establish a defense to the crimes alleged"); *In re Extradition of Powell*, 4 F. Supp. 2d 945, 958 (S.D. Cal. 1998) (denying fugitive's motion to introduce evidence, and finding that fugitive was "foreclosed from presenting evidence as to the unreliability of witnesses because . . . [that would] change an extradition hearing into more than it is meant to be, *i.e.*, a minitrial" and "it is inappropriate to present evidence contradicting that proffered by the [requesting country]"); *see also, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005) (affirming denial of discovery regarding the use of the death penalty in Thailand in an extradition to that country because the issue "was outside the purview" of the court); *In re Extradition of Singh*, 124 F.R.D. 571, 577-78 (D.N.J. 1987) (denying request for depositions intended to uncover evidence affecting credibility or reliability of affidavits supporting extradition); *In re Atias to Israel*, 916 F. Supp. 2d 915, 930 (E.D. Mo. 2012) (denying requests for discovery of "items relate[d] to issues of a defense to the charges or the credibility of the [requesting country's] evidence").

*/s/ Christopher J. Smith*
CHRISTOPHER J. SMITH
Acting Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID No. A5502264
1301 New York Avenue NW
Washington, D.C. 20530
Tel: (202) 532-4154
Fax: (202) 514-0080

*/s/ Rebecca A. Haciski*
REBECCA A. HACISKI
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID No. A5502265
1301 New York Avenue NW
Washington, D.C. 20530
Tel: (202) 616-2534
Fax: (202) 514-0080

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 22, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and therefore on counsel of record.

*/s/ Robert J. Emery*
Assistant United States Attorney